231 N.J. Super. 422 (1988)
555 A.2d 752
LOUISE PALMENTIERI, A RESIDENT AND TAXPAYER OF THE CITY OF ATLANTIC CITY, AND SETH GROSSMAN, A RESIDENT, TAXPAYER AND COUNCILMAN OF THE CITY OF ATLANTIC CITY, PLAINTIFFS,
v.
CITY OF ATLANTIC CITY, A MUNICIPAL CORPORATION OF NEW JERSEY, AND SAVIO, REYNOLDS & DRAKE, A PARTNERSHIP OF NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Law Division Atlantic County.
Decided June 15, 1988.
*424 Louise Palmentieri, pro se.
Seth Grossman, pro se.
Matthew H. Powals, for defendant City of Atlantic City.
WILLIAMS, A.J.S.C.
This matter comes before the court by way of an action in lieu of prerogative writs seeking to set aside resolution 85 of 1988, which was adopted by the City Council of Atlantic City on February 17, 1988. The resolution, subject to certain limits, authorizes the city to pay for a defense and indemnify Gene Dorn in connection with a defamation suit filed against him in Superior Court.
In May 1987 a group of Atlantic City residents came together to form the Citizens for Action Committee. The founders of the group, all of whom were black, were concerned with what they perceived as racism in the community, involving the local newspaper and the employment practices of the casinos. They felt that the existing local organizations were either not aggressive enough or were unable to address these problems.
After several meetings the organization began to take shape. A name was agreed upon and officers were selected. Gene Dorn, an Atlantic City councilman from the third ward, was selected as president. Dorn did not solicit the position. He was chosen for the leadership of the organization for reasons expressed by witnesses in the following manner: He was a councilman; he could enhance the group's position; he had "clout"; he could open doors; he could get things done. It is clear that Dorn was selected as president of the group because *425 of the benefits which the members believed would inure to the group by reason of his public status. He reluctantly accepted the position.
The activities of the group were directed to the staging of a July 4th rally which would focus public attention on the concerns for which the group was formed. The rally was to be called a "Black Unity" rally. On June 17, 1987, Dorn applied to the city for a parade permit. He listed the name of the organization applying as the "Citizens for Action Committee" and described it as a "civic" organization. The rally was to begin at Columbus Park, parade to the Boardwalk and then return to Columbus Park for a series of speeches. A permit approving the rally was issued the same day to "(Gene Dorn) Citizens for Action Committee." The permit for the rally was expedited past the normal channels and was approved personally by the mayor. The mayor told the city administrator that he wanted full cooperation to be given to those staging the rally. The city provided use of its "showmobile" (portable stage), free of charge. It should be noted that such was also done for other nongovernmental organizations as well. Public works department employees set up and took down the stage, and the police provided security at no charge to the committee.
Various steps were taken to promote the rally. A press release was prepared and issued by Clint Walden, the vice-president of the committee. Walden also prepared and distributed fliers which read as follows:
JOIN US IN A BLACK
UNITY RALLY
SATURDAY, JULY 4, 1987
10:00 A.M.
COLUMBUS PARK
MISSOURI AND ARCTIC AVENUES
 SHOW SOLIDARITY WITH THE COMMUNITY

*426  PARTICIPATE! SHOW YOUR OPPOSITION TO:
 LACK OF BLACKS IN KEY CASINO POSITIONS
 MISTREATMENT OF BLACKS BY THE CASINOS
 INSTITUTIONAL RACISM OF THE PRESS NEWSPAPER IN BOTH EDITORIAL AND EMPLOYMENT PRACTICES
 RACIST CITY OFFICIALS WHO TAKE BLACK VOTES FOR GRANTED AND VOTE ONLY FOR ISSUES FOR THE 5th AND 6th WARDS
The initial draft of the flier was identical to the final draft with one exception. In the initial draft the word "white" in parenthesis was located under the words "5th and 6th Wards" on the bottom line. In addition, Dorn sent out a letter on his official stationery addressed to third ward residents. Dorn's constituency is primarily black. The letter read in part as follows:
.... We are asking you to sacrifice your valuable time and join us in order to:
 Demonstrate to the casino industry our unhappiness at their treatment of Blacks in the casino industry and lack of advancement for Atlantic City Blacks in the high paying positions.
 Show everyone that we will not accept any plan that dilutes the ability of you the voters to have a voice in their government.
 Protest the treatment that Black officials and community groups receive by The Press newspaper and the lack of Blacks on the staff and management of The Press.
 Oppose those city Councilmen that take your vote for granted and vote against Black people every chance they get while telling you they like you.
Although the committee decided who would speak at the rally, the decision was basically left up to Clint Walden. Virtually every black civic and governmental leader in the Atlantic City area was invited to speak and did so. The speakers included the mayor, a freeholder, four councilmen and various civic leaders. There was not a single white leader invited to speak or in any way participate in the rally. City council was not invited to designate a spokesperson or to act in any official way with respect to the rally or its purposes. The evidence revealed that five of the nine city councilmen were white. Only the black members of council were invited to the rally. Umar Salahuddin, one of the officers of the committee, explained this practice. He indicated that the committee wanted to concentrate *427 on raising support within the black community. They wanted to know how committed the black leaders of the community were. Thus, the invitations to participate and speak went only to blacks.
At the rally there were approximately a dozen speakers. Although he was reluctant to speak, Dorn did so as the last speaker of the day. He spoke for about two minutes. Approximately 10 to 15 minutes after the rally, Dorn was interviewed by John Froonjian, a reporter for the Atlantic City Press. In the interview Dorn made reference to Alfred Cade, a black executive with Caesars Hotel Casino, saying:
We feel Caesars represents the mentality of the majority of casinos.... They have Al Cade, who we feel is as racist as the most bigoted white man walking on the face of the earth.
This statement, which was acknowledged by Dorn in his testimony herein, was reported in the July 5, 1987 edition of the Atlantic City Press.
Thereafter, on September 9, 1987, a complaint was filed in the Superior Court by Alfred J. Cade against Gene Dorn, seeking compensatory and punitive damages for defamation.
On January 20, 1988, the city council of Atlantic City adopted resolution 45 of 1988, which authorized the mayor to execute a contract with Thomas R. Ashley for the purpose of providing a legal defense for Councilman Dorn against the defamation action. That resolution was challenged in a prior suit in lieu of prerogative writs brought by the same plaintiffs herein. Council's action was set aside by this court by reason of Councilman Dorn's conflict of interest in voting to support the resolution.
Council thereafter adopted resolution 85 of 1988 by a vote of four to three, with Councilman Dorn abstaining. That resolution, in pertinent part, provided:
NOW THEREFORE, BE IT RESOLVED by the City Council that the Mayor is hereby authorized to execute and City Clerk to attest a contract with Thomas R. Ashley, Esquire, to represent Councilman Gene Dorn in the above referenced litigation at the rate of one hundred ($100.00) per hour, not to exceed twenty thousand ($20,000.00) dollars; and

*428 BE IT FURTHER RESOLVED that the City Council shall indemnify and pay on behalf of Councilman Dorn for any exemplary or punitive damages arising from the above mentioned law suit....
This suit in lieu of prerogative writs followed, seeking to once again set aside the attempt by council to defend and indemnify Dorn.
The City of Atlantic City is not a named defendant in the defamation suit which has spawned this litigation. Nor is there any threat that the city can be found directly or vicariously liable in that case, since no notice of tort claim has been filed. The issue before us has arisen because of the city's resolution No. 85 of 1988 approving the costs of defense and indemnification for any damages which may be assessed against Dorn. That issue is whether the city may voluntarily assume Gene Dorn's liability under the facts as presented.
Counsel for Atlantic City argues that municipal enactments, whether by ordinance or resolution, are to be afforded a strong presumption of validity by reviewing courts. N.J. Const. (1947), Art. IV, § VII, par. 11; Dock Watch Hollow Quarry Pit, Inc. v. Warren Twp., 142 N.J. Super. 103 (App.Div. 1976), aff'd 74 N.J. 312 (1977). However, a different standard of review is warranted when the validity of the municipal determination involves a matter of law. Riggs v. Long Beach Tp., 101 N.J. 515 (1986), on remand to App.Div. 212 N.J. Super. 69 (App.Div. 1986), certif. granted 107 N.J. 81 (1987). Since discerning the law is peculiarly a judicial function, the court need not defer to the judgment of the council, board or agency below. Grancagnola v. Planning Bd., 221 N.J. Super. 71 (App.Div. 1987).
In this case, resolution of the dispute turns on whether the City of Atlantic City has the statutory or common-law authority to take the action authorized in resolution 85. In that regard, the inquiry here is not an ordinary question of reviewing the propriety of an exercise of a municipality's police power. Rather, this court must decide, as a matter of law, based on these facts, whether the city has acted correctly.
*429 The court begins its analysis with a long-standing common-law tradition. The law has always recognized "a moral obligation" of the sovereign "to pay expenses honestly incurred" "in good faith" by public officers in furtherance of governmental purposes. State, Lewis, pros., v. Freeholders of Hudson County, 37 N.J.L. 254 (Sup.Ct. 1874). In that case the county coroner sought reimbursement for expenses incurred in bringing a murderer to trial. The board of chosen freeholders authorized payment and a taxpayer sued to invalidate the resolution. Plaintiff-taxpayer claimed that, since the county was not legally chargeable with the expenses, the resolution was a misappropriation of public funds. In upholding the resolution, the court reasoned that it was "the duty of the board to raise such sums of money for prosecuting and defending the rights, defraying the public and other necessary charges, and doing, fulfilling and executing all legal purposes, objects, business, and affairs of the county...." Id. at 256. The expenses of the coroner were found to be clearly in furtherance of the county's responsibility to administer justice, and therefore, the expenses were chargeable to the county.
This common-law protection extends to costs incurred in defending lawsuits brought against public officials who are executing the powers and duties of their office or carrying out a governmental obligation. In State, Bradley, prosecutor, v. Council of Hammonton, 38 N.J.L. 430 (Sup.Ct. 1876), a city councilman was sued for malicious prosecution when he initiated a council-authorized suit against a prosecutor who was believed to have defrauded the town. The court there ordered the municipality to pay the costs of the councilman's defense, finding that his actions were clearly engendered by a "town purpose," hence were properly chargeable as a public appropriation.
More recently this common-law obligation has been recognized in the case of Cobb, et als., v. City of Cape May, et als., 113 N.J. Super. 598 (Law Div. 1971). There the court said: "The law is well settled that a public official is entitled to compensation *430 for expenses incurred in the performance of his official duties." Id. at 600.
Our Legislature has recognized this "moral obligation" of government and has specified certain circumstances under which that responsibility becomes mandatory. Under N.J.S.A. 18A:12-20 members of local boards of education are entitled to the costs of their defense in proceedings brought against them "for any act or omission arising out of and in the course of the performance of [their] duties as a member of a board of education...." See also N.J.S.A. 18A:16-6. A similar benefit is afforded police officers under N.J.S.A. 40A:14-155.
More generally, a municipality may provide protection to its employees and officials in accordance with the New Jersey Tort Claims Act, N.J.S.A. 59:1-1 et seq. This authority is found in N.J.S.A. 59:10-4, which provides:
Local public entities  authority to indemnify
Local public entities are hereby empowered to indemnify local public employees consistent with the provisions of this act.
The comment to that section underscores that the local protection under the act is permissive only, in contrast to the mandatory indemnification of state employees. To discern what indemnification may or may not be undertaken by a city, we must turn to other sections of the act. It should be stated initially that to be consistent with the Tort Claims Act the term "indemnify" in that section must be read to encompass both the costs of defense and reimbursement for any monetary damages. Chapter 2 of the Tort Claims Act sets forth the immunities and liabilities of the public entity. The chapter begins by establishing vicarious liability under the doctrine of respondeat superior:
Liability of public entity.
a. A public entity is liable for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same *431 manner and to the same extent as a private individual under like circumstances. [N.J.S.A. 59:2-2]
See also the comment to that section.
The next few sections detail particular areas of governmental activities which are excluded from liability. The chapter then concludes with N.J.S.A. 59:2-10, which provides:
A public entity is not liable for the acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct.
When N.J.S.A. 59:10-4, 59:2-2 and -10 are read together, it is clear that a municipality can only indemnify an employee or official for acts within the scope of employment and which are not criminal, fraudulent, malicious or instances of willful misconduct. If, by the terms of the Tort Claims Act, a municipality could not be liable for certain acts, then it would follow that a municipality's voluntary assumption of the responsibility would be ultra vires as serving no public purpose.
Furthermore, N.J.S.A. 59:3-14 makes it clear that the immunity of the Tort Claims Act is unavailable to any employee for acts outside the scope of employment or which constitute a crime, actual fraud, actual malice or willful misconduct. That employee is liable for the full measure of recovery which could be assessed against any defendant in the private sector.
Whether the authority to indemnify originates under the common law, the Tort Claims Act or a specific statute, such as for boards of education, the analysis initially focuses on what acts can be characterized as being "within the scope of employment." Our courts have cited several authorities in attempting to define the concept. In DiCosala v. Kay, 91 N.J. 159 (1982), our Supreme Court said: "The scope of employment standard, concededly imprecise, is a formula designed to delineate generally which unauthorized acts of the servant can be charged to the master." Id. at 169. The Court cited Prosser's definition:
... This highly indefinite phrase, which sometimes is varied with "in the course of the employment," is so devoid of meaning in itself that its very vagueness has been of value in permitting a desirable degree of flexibility in decisions. It is obviously no more than a bare formula to cover the unordered and unauthorized acts of the servant for which it is found to be expedient to *432 charge the master with liability, as well as to exclude other acts for which it is not. It refers to those acts which are so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment. [Prosser, Law of Torts (4 ed. 1971) at 460-461].

McQuillan suggests:
... Factors to be considered in determining whether a municipal employee's conduct falls within the course and scope of his or her employment are whether his or her conduct was primarily employment rooted, was reasonably incidental to the performance of employment duties, occurred on employment premises, and occurred during working hours. Generally, the question whether the employee was acting within the scope of his employment should be deposited with the jury for resolution. [Footnotes omitted] [McQuillan, Municipal Corporations (3 ed.), § 53.69 at 405]
In the case of Cobb v. City of Cape May, supra, the mayor was sued for libel when he made certain statements concerning the lack of qualifications of the city manager and the resulting termination of the manager from that position. A taxpayer sued to prevent the city from paying for the mayor's defense. In determining whether the mayor was acting "within the scope of his employment" the court turned to authorities outside New Jersey. An analogous case from Connecticut was cited:
... The officer must have been acting in a matter in which the corporation has an interest, he must have been acting in the discharge of a duty imposed or authorized by law and he must have acted in good faith. [113 N.J. Super. at 601 (citing Maitland v. Town of Thompson, 129 Conn. 186, 27 A.2d 160 (Sup.Ct. 1942))]
The various considerations were well combined in Marley v. Palmyra Bor., 193 N.J. Super. 271, 295-296 (Law.Div. 1983). Judge Haines concluded in that case that the "scope of employment" issue must be tested in light of the many rules cited, but ultimately is a sensitive question of fact.
It is now this court's role to view, assess and adjudge all the facts in light of the parameters set forth above. We begin by noting that Atlantic City is a Faulkner Act municipality governed by a mayor-council form of government under N.J.S.A. 40:69A-1 et seq. The mayor's function is described as administrative or executive, while the council is the legislative and *433 investigative body. N.J.S.A. 40:69A-32. The council's responsibilities are more specifically described in N.J.S.A. 40:69A-36:
C. COUNCIL
40:69A-36. Legislative power
The legislative power of the municipality shall be exercised by the municipal council, subject to the procedures set forth in this plan of government. Legislative powers shall be exercised by ordinance, except for the exercise of those powers that, under this plan of government or general law, do not require action by the mayor as a condition of approval for the exercise thereof, and may, therefore, be exercised by resolution, including, but not limited to:
a. The override of a veto of the mayor;
b. The exercise of advice and consent to actions of the mayor;
c. The conduct of a legislative inquiry or investigation;
d. The expression of disapproval of the removal by the mayor of officers or employees;
e. The removal of any municipal officer for cause;
f. The adoption of rules for the council;
g. The establishment of times and places for council meetings;
h. The establishment of the council as a committee of the whole and the delegation of any number of its members as an ad hoc committee;
i. The declaration of emergencies respecting the passage of ordinances;
j. The election, appointment, setting of salaries and removal of officers and employees of the council, subject to any pertinent civil service requirements and any pertinent contractual obligations, and within the general limits of the municipal budget;
k. Designation of official newspapers;
l. Approval of contracts presented by the mayor;
m. Actions specified as resolutions in the "Local Budget Law" (N.J.S. 40A:4-1 et seq.) and the "Local Fiscal Affairs Law" (N.J.S. 40A:5-1 et seq.); and
n. The expression of council policies or opinions which require no formal action by the mayor.
As that statute explains, a city council exercises the legislative power of the municipality by ordinance. Certain other activities listed, though not exhaustively, may be accomplished by resolution.
It would be too constrained a construction of the statute to exclude from its intent every activity which is not either effected by ordinance or resolution. A more reasonable reading would include within the statutory scope those activities which *434 are incidental to, or reasonably calculated to result in, legislation or legislative efforts. Petition of Hackensack Water Co., 196 N.J. Super. 162 (App.Div. 1984).
The testimony at trial showed that Walden and Salahuddin, and other private citizens, organized the Citizens for Action Committee to combat what they perceived to be grave inequities in several local institutions, including city council. Dorn was invited to participate and lead the organization. His personal beliefs in the cause, his reputation as a man of action and his stature as a city councilman all were desirable attributes to the organizers of the Citizens for Action Committee. This group was formed to redouble, or actually supersede the efforts of other organizations such as the N.A.A.C.P. and the Congress of Community Organizations. It was felt by the founders of the Citizens for Action Committee that neither the existing civic organizations nor the city government were aggressively addressing the problems they perceived. The Citizens for Action Committee was conceived and matured at a series of meetings held at the Uptown and Westside Complexes. The organizers invited other black city officials for the same reasons as Dorn had been invited  credibility and clout. These officials, including other black members of city council, were invited by and responded to the Citizens for Action Committee. They were not sent by the city government. It was clear at trial that no ordinance was pending, no resolution authorized their attendance at the rally, no investigation was ongoing, no legislative process was being conducted or intended. The lack of this formal action, of course, does not per se exclude the activity from the scope of official duties.
The July 4th rally was planned as the major expressive medium of the Citizens for Action Committee. It was announced in a press release written by organizer Clint Walden. Councilman Dorn drafted a letter to his constituents exhorting them to attend and a flier was prepared and distributed to garner public support for the rally. The contents of that flier have been set forth previously herein. The Citizens for Action *435 Committee called for a rally to focus public awareness and to spur some action against what it perceived to be the three most egregious areas of racial inequities in the city: the casino industry's hiring practices, the Press newspaper's editorial and employment policies and other officials who vote only for the benefit of the white wards of the city. These subjects raise the question of whether the municipal government of Atlantic City could properly be involved in these areas at all and, if so, how it may be involved. The court takes notice that by statute the Casino Control Commission is the branch of government charged with implementing and regulating all aspects of the casino industry. The Casino Control Act contains affirmative action and equal employment provisions which are mandatory prerequisites to licensure of any casino hotel or casino service industry. N.J.S.A. 5:12-134. The power and obligation to enforce the mandates of § 134 are also vested in the commission. N.J.S.A. 5:12-135. Those programs and powers are detailed in regulations found at N.J.A.C. 19:53-1.1 et seq. A comprehensive regime of nondiscriminatory hiring practices is imposed upon the casino industry by state statute, implemented by the joint efforts of the Casino Control Commission and the casino entities, and monitored by the state division of gaming enforcement and the commission.
The Press newspaper is a private local enterprise, but its hiring practices may be subject to existing federal and state civil rights laws. Its editorial practice, however, may be criticized but never circumscribed by government. The First Amendment is an impervious aegis against all attempts by government to regulate, curtail or dictate free speech.
The final topic of protest decried purportedly racist city officials and voting practices. The original draft of the flier specified "white" officials as the transgressors and the testimony adduced that by design white city council members were not invited to speak at the rally.
*436 The question of whether racism can properly be a concern of the Atlantic City government may be answered in the affirmative. Racial discrimination in any form and any milieu is an offense to all government and all individuals, morally and legally. However, not all action in opposition to racial discrimination is necessarily governmental action. Civic groups and individuals may also act in this area in a private capacity. The fact that such groups are joined by governmental officials does not necessarily clothe their actions with governmental authority.
City council is empowered to act in a corporate capacity and in that capacity may also delegate individuals or groups to act on its behalf. Such was not done in this case.
Here, one of the purposes of the rally was to protest employment practices of the casinos. Even though the Casino Control Act pervasively regulates this area, the City of Atlantic City is not completely pre-empted from acting as well. Council in the past, through its police powers, has imposed minority set-aside and affirmative action conditions upon other commercial ventures within the city. See Ordinance 28 of 1976, Ordinance 45 of 1978, Ordinance 14 of 1979, and Ordinance 44 of 1979. The distinction between governmental and private action is that in pursuance of its governmental responsibilities the city council acted as a body to adopt the policies behind the cited ordinances and to legislate them into effect.
A second purpose of the rally was to protest the editorial policies of the local newspaper. Although individual citizens are free to criticize and condemn editorial policies as they wish, under the First Amendment governmental action may not be so uninhibited.
The Atlantic City Council is composed of four black and five white members, yet all white members were excluded from the Citizens for Action Committee and participation in the rally. A city council acts as a body; factions of that body are not government. Condemnation of other councilmen as part of the *437 internecine struggles of a council, especially when sides are racially drawn, is not equivalent to the actions or policies of government. The city councilmen who joined the Citizens for Action Committee and spoke at the rally were lending their political weight and their personal convictions to a civic organization. The exclusion or, rather, non-inclusion of white council members was explained by Salahuddin: invitations were extended only to black leaders, to force them to declare their convictions. The focus of the rally was on forging black unity in the black community, to combat racial problems which the organizers of the Citizens for Action Committee felt were being inadequately addressed by government and existing civic organizations.
It becomes evident in reviewing the facts and events that, although the Atlantic City government could have addressed some of the problems highlighted by the Citizens for Action Committee, how those subjects were raised and addressed was in fact not the action of government. The July 4th rally was planned, publicized and participated in by private individuals espousing a personal cause. There was no action or discussion by the governing body concerning the rally, policies, or activities of the Citizens for Action Committee. Private action which excludes significant numbers of public representatives cannot thereafter, with hindsight, be transformed to governmental action. Furthermore, exclusion of public officials from participation in the rally solely on the basis of race, while allowable for private activity, is inconsistent with any legitimate governmental activity.
The mayor's endorsement and the city services which facilitated the rally do not convert the activity into a government function. The evidence showed that the city had no clear guidelines as to when such services are provided free and when they must be paid for. The waiver of police and insurance costs and the gratuitous lending of the showmobile were not shown to be so inconsistent with treatment accorded other *438 functions that this court could conclude that those factors weighed heavily either way.
The court's responsibility is to glean the substance of the activities of the Citizens for Action Committee, the rally and Dorn, regardless of how they are characterized by either party to this litigation.
This court concludes that, although racism is a serious concern of all government, the Citizens for Action Committee was a purely civic organization formed to broach the problem through citizen awareness and public exposition at the July 4th rally. Dorn attended as its president, lending his stature as a city councilman, but not his authority. To conclude otherwise would be to widen the scope of the governmental ambit to include every civic, religious, charitable or fraternal organization merely because its tenets are embraced and publicly endorsed by a government official. Such a result would be untenable.
The exact timing and context in which the statement was made pose more serious doubts as to whether Dorn was acting in the scope of his responsibilities. At trial Dorn did not deny uttering the statement against Cade; it was revealed, however, that the communication was made not on the public platform of the rally, but rather moments afterward to a reporter. It may very well be within contemplation for a public officer to address the issues which affect his constituency and to disseminate information relating to those issues or his governmental stance in dealing with those issues, as was the situation in Cobb. This statement, however, was a purely personal vilification of a private individual. A public official is generally liable for defamatory statements unless made in discharging his official duties. McQuillan, Municipal Corporations (3 ed.), § 12.211d. Dorn's words may have been sought out by the Press only because he was a city councilman, but it stretches the imagination to believe that his statement about Cade in any way expressed a policy or rationale, fulfilled or discharged a *439 duty, or furthered an interest of the City of Atlantic City. The surrounding circumstances make this case directly analogous to the leading case of Errington v. Mansfield Tp. Bd. of Ed., 81 N.J. Super. 414 (App.Div. 1963), certif. granted 41 N.J. 519 (1964), 42 N.J. 320 (1964), 100 N.J. Super. 130 (App.Div. 1968). There, the president of the board of education published a letter denigrating a severe critic of the board's policies. The trial court concluded and the Appellate Division twice upheld that the letter was a personal attack for which the board president was solely liable. The letter had been read and approved prior to publication by two other members of the board. After suit, the entire board declared that the letter had been written on behalf of the body and therefore the costs of defense should be borne by the board. This was insufficient to cure the purely personal nature of the offense and insulate the writer.
Here, there was no evidence from any other government official that Dorn's statement had been authorized or expressed the belief or policy of the City of Atlantic City. His office cannot insulate him from the risks that any other citizen faces in expressing personal opinions. Neither the participation in, nor facilitation of, the rally by other officials, nor the resolution to defend Dorn, breathes any official municipal legitimacy into the personal comments made by him. Addressing a public issue may be discharging a public duty; personifying an issue by a personal attack upon an individual totally unrelated to municipal government or to a councilman's responsibilities within that government is not a discharge of a public duty.
This court's inquiry does not end with a determination that Dorn's statements were not within the scope of employment.
Earlier in this opinion the requisites for indemnification under the Tort Claims Act were set forth in N.J.S.A. 59:10-4, 59:2-2 and -10. As read together: A municipality may indemnify an official for acts within the scope of employment, but which are not criminal, fraudulent, malicious or willful acts of misconduct. In fact, the legislative declaration in N.J.S.A. *440 59:1-2 explains that a public entity may only be liable for its "negligence within the limitations of this act." This underscores the Legislature's intent to disclaim liability for the intentional or willful misconduct of an official. Under the common law, "It is the settled rule in this State that public officers have no protection `from the consequences of their misfeasance [even] in the performance of their public duties.'" Milstrey v. Hackensack, 6 N.J. 400, 412 (1951). N.J.S.A. 59:3-14 merely codifies this principle. Borrowing from the court's analysis in Marley v. Palmyra Bor., supra:
.... Funk & Wagnall's Standard College Dictionary (1977) defines "willful" as "voluntary; intentional; to behave (oneself) improperly." Lobdell Car Wheel Co. v. Subielski, 32 Del. 462, 125 A. 462, 464 (1924) held that
[a] willful act may be described as one done intentionally, knowingly and purposely, without justifiable excuse, as distinguished from an act done carelessly, thoughtlessly, needlessly, or inadvertently.
"Misconduct" in Mandella v. Mariano, 61 R.I. 163, 200 A. 478, 479 (1938) was said to be
[a] transgression of some established and definite rule of action, a forbidden act, a dereliction from duty, unlawful behavior, willful in character, improper or wrong behavior. Synonyms are misdemeanor, misdeed, misbehavior, delinquency, impropriety, mismanagement, offense, but not negligence or carelessness. [193 N.J. Super. at 294]
The allegation in Cade v. Dorn is that Dorn uttered certain statements to a third party. That allegation is not denied: the inescapable conclusion is that Dorn's conduct in communicating the statements was willful. Our Appellate Division has confirmed that the Tort Claims Act provisions not only deny public-employee immunity for willful acts, but further provide that any damages may be recovered only against the individual employee, personally. N.J.S.A. 59:3-14; Fuchilla v. Layman, 210 N.J. Super. 574, 579 (App.Div. 1986).
This court need not await the outcome of the case of Cade v. Dorn to determine whether Dorn may be indemnified by the city. If a cause of action for defamation is established and damages are assessed, it is clear that it would be impermissible for the city to indemnify Dorn for those damages, because his actions would necessarily constitute willful misconduct. As *441 such Dorn's conduct would therefore be beyond the city's common-law or statutory authority to indemnify.
In conclusion, this court finds that Gene Dorn was not acting within the scope of his official duties when he uttered the statements against Cade. The Citizens for Action Committee and its rally were purely civic involvements, rather than governmental efforts. The statements made after the rally were even more remote from being an officially warranted or authorized duty. Because his act was outside the scope of his municipal responsibilities, the City of Atlantic City has no authority to provide Dorn with indemnity or the means of his defense.
This court further finds that the statements made were willful, hence should any damages be assessed against Dorn the city is without authority to indemnify him against that judgment.
During the course of the trial and the preparation of this opinion, this court has been acutely aware of the sensitive nature of the issues involved. A great concern has been expressed that there are many inequalities which yet must be remedied in our community. The goal of fighting racism is laudable. The strategy of the Citizens for Action Committee to begin by uniting the black community and to publicly commit black leaders is understandable. This strategy was effective in achieving the participation of the mayor and four councilmen in the rally. But not every public appearance by a public official brings that official's conduct within the scope of governmental activity. Where the appearance was not authorized by action of the city council, where the event was organized by a private organization, where the councilman involved was president of that organization, where the strategy employed was aimed at only one racial group in the community and where invitations to participate were given on a racially exclusive basis, it cannot be said that such falls within the scope of governmental activity.
*442 For the foregoing reasons, judgment will be entered in favor of plaintiff, invalidating resolution 85 of 1988 and restraining the City of Atlantic City from indemnifying or defending Gene Dorn in the matter of Cade v. Dorn, presently pending in this court.