252 N.J. Super. 122 (1991)
599 A.2d 548
C.J., PLAINTIFF-APPELLANT,
v.
ROBERT G. VUINOVICH, STATE OF NEW JERSEY, DEPARTMENT OF DEFENSE, NEW JERSEY MILITIA  ARMY NATIONAL GUARD, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Submitted October 29, 1991.
Decided November 22, 1991.
*124 Before Judges PRESSLER, SHEBELL and D'ANNUNZIO.
Louis Raveson, attorney for appellant.
Robert J. Del Tufo, Attorney General, attorney for respondents (Michael R. Clancy, Assistant Attorney General, of counsel; Glenn R. Jones, Deputy Attorney General, on the brief).
The opinion of the court was delivered by SHEBELL, J.A.D.
This is an appeal from the grant of summary judgment dismissing an action brought by plaintiff, C.J., a former member of the New Jersey National Guard, against the New Jersey Department of Defense, New Jersey Militia, Army National Guard, and Sergeant Robert G. Vuinovich. We affirm.
Plaintiff alleged that in 1977 he became a member of the New Jersey National Guard (Guard), and that he re-enlisted several times, ultimately extending his service through November of 1990. In 1987 or 1988, plaintiff was ordered by the Guard to undergo a blood test for antibodies to HIV as part of a mandatory testing program.
*125 On March 25, 1988, plaintiff reported for duty at the Teaneck Armory with Company C, 104th Engineer Battalion, and was transported to West Point, New York, for weekend exercises. Late that evening, at West Point, defendant, Sergeant Vuinovich, called roll during Company formation, but did not call plaintiff's name. When plaintiff inquired why his name had not been called, the sergeant allegedly responded in front of the assembled company members "you have AIDS and you are discharged." The mandatory testing had revealed that plaintiff's blood was positive for HIV antibodies. He, however, maintained he was not ill and was able to perform all of his Guard duties. Plaintiff alleged he had received no prior notice of his discharge, although the Guard contends that it forwarded a letter notifying him that he would be transferred to reserve status effective March 8, 1988.
Plaintiff alleged that as a result of Vuinovich's statement, plaintiff spent the night in a tent isolated and shunned, until transported back to New York City the next day. He alleges he has since been excluded from all Guard activities, avoided by friends, and that because of Vuinovich's statement he believed that he had AIDS and was in imminent danger of death. He maintained that after his return home he continued in fear of imminent death and attempted suicide. Subsequently, plaintiff sought and received advice in a public clinic regarding his health and his HIV antibody status.
Although he cannot satisfy the $1,000 medical expense threshold requirement, plaintiff seeks recovery under the New Jersey Tort Claims Act (NJTCA) for damages for emotional distress only. N.J.S.A. 59:9-2; see Ayers v. Jackson Tp., 106 N.J. 557, 577, 525 A.2d 287 (1987). Plaintiff urges that under the provisions of N.J.S.A. 59:3-14 the willful nature of Vuinovich's conduct and the fact that his statements were outside the scope of his official duties require that his damages claim not *126 be barred by the NJTCA.[1]
N.J.S.A. 59:3-14 provides:
a. Nothing in this act shall exonerate a public employee from liability if it is established that his conduct was outside the scope of his employment or constituted a crime, actual fraud, actual malice or willful misconduct.
b. Nothing in this act shall exonerate a public employee from the full measure of recovery applicable to a person in the private sector if it is established that his conduct was outside the scope of his employment or constituted a crime, actual fraud, actual malice or willful misconduct.
To support his position, plaintiff relies upon Palmentieri v. Atlantic City, 231 N.J. Super. 422, 555 A.2d 752 (Law Div. 1988). In Palmentieri, an Atlantic City councilman helped organize a "Black Unity" rally, which was sponsored by a private group of citizens. "Approximately 10 to 15 minutes after the rally, [the councilman] was interviewed by ... a reporter[,]" and criticized an Afro-American casino executive stating "we feel [he] is as racist as the most bigoted white man walking on the face of the earth." Id. at 427. The court held that these comments were not performed within the scope of the councilman's public duties, stating:
This statement, however, was a purely personal vilification of a private individual. A public official is generally liable for defamatory statements unless made in discharging his official duties. McQuillan, Municipal Corporations (3 ed.), § 12.211d. Dorn's words may have been sought out by the Press only because he was a city councilman, but it stretches the imagination to believe that his statement about [the casino executive] in any way expressed a policy or rationale, fulfilled or discharged a duty, or furthered an interest of the City of Atlantic City. [Id. at 438-39, 555 A.2d 752].
Accordingly, the Law Division judge concluded that the city was not permitted to indemnify or defend the councilman in the defamation action. Id. at 442, 555 A.2d 752.
In this case, plaintiff argues that the way in which Sergeant Vuinovich informed him that he had been discharged because of his HIV status demonstrates it was a malicious act, clearly outside the scope of his employment. However, based upon our *127 careful review of the facts, we conclude that the sergeant was acting within the scope of his employment when he informed the plaintiff of his military status. Sergeant Vuinovich did not himself discharge plaintiff; rather, an official Guard order, dated March 1, 1988, listed plaintiff's name as a member of the Guard who had been "discharged from the Army National Guard and assigned to component indicated on day following effective date." When plaintiff asked the sergeant why plaintiff's name had not been called at roll call during a Company formation at West Point, the sergeant, while in uniform and acting in his official capacity, responded to the inquiry.
The sergeant's statements may have been unwise; however, it is clear that he was answering a question of a subordinate military person while engaged in his duties as a Guard officer. The public official in Palmentieri made defamatory statements to the press while he was engaged in a rally sponsored by a private organization. The councilman also made statements to further the interests of a private organization, whereas Sergeant Vuinovich was on duty and furthering Guard business when he answered plaintiff's direct inquiry.
Plaintiff mistakenly relies upon Marion v. Borough of Manasquan, 231 N.J. Super. 320, 329, 555 A.2d 699 (App.Div. 1989) for the proposition that damages may be awarded to plaintiff under the NJTCA. In Marion, plaintiffs brought an action against the municipality and individual officers for unlawfully arresting and detaining them. Id. at 324, 555 A.2d 699. There, we concluded that the individual officers could be held liable for unlawful detention even though a claim against the borough would fail. Id. at 331, 555 A.2d 699. However, this result was compelled by the provisions of N.J.S.A. 59:3-3, which specifically denies immunity to public employees for false arrest or false imprisonment.
Plaintiff argues that Sergeant Vuinovich's willful public disclosure of plaintiff's HIV status is an actionable cause of action for: (1) defamation, (2) public disclosure of private facts, *128 or (3) intentional or negligent infliction of emotional distress. Relying on Doe v. Borough of Barrington, 729 F. Supp. 376 (D.N.J. 1990), plaintiff argues that HIV-related information must be held in confidence as part of a citizen's right to privacy absent a compelling governmental interest.[2] Further, plaintiff quotes Woods v. White, 689 F. Supp. 874, 877 (W.D.Wis. 1988), aff'd, 899 F.2d 17 (7th Cir.1990), for the proposition that "it would have been clear to a competent public official in 1986 that individuals had a constitutional right to privacy in information relating to AIDS." Id. Plaintiff argues that Sergeant Vuinovich acknowledged that HIV-related information was supposed to be held in confidence and, therefore, asserts that Vuinovich's statement could "only be interpreted as a wanton and malicious comment."
In Jorden v. National Guard Bur., 799 F.2d 99 (3d Cir.1986), cert. denied, Sajer v. Jorden, 484 U.S. 815, 108 S.Ct. 66, 98 L.Ed.2d 30 (1987), the court examined whether National Guard officers enjoyed immunity from liability for civil damages. Id. at 100-01. The plaintiff had "brought a civil rights suit ... alleging that his various supervisors had engaged in a conspiracy to harass him and to discharge him on the basis of race.... Specifically, he asserted claims for damages under 42 U.S.C. § 1983, § 1985 and § 1986 against ... both his military officers and his civilian supervisors, [including] a pendent state common law claim of defamation...." Id. at 102. The Jorden court held as follows:
The clear implication of Chappell [Chappell v. Wallace, 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983)] is that while some non-damage constitutional claims involving the military remain viable, damage claims do not. The Stanley [Stanley v. United States, 574 F. Supp. 474 (S.D.Fla. 1983), aff'd, 786 F.2d 1490 (11th Cir. 1986)] court's approach would frequently require courts to make difficult and hair-splitting distinctions as to whether a particular claim *129 was the sort that, if legally actionable, would threaten military discipline. This approach seems questionable as a matter of policy. In any event, we simply do not read Chappell as sanctioning this kind of case-by-case approach.

We thus believe that the Supreme Court was laying down a general rule barring damages actions by military personnel against superior officers for constitutional violations, rather than authorizing a fact-specific inquiry. [Id. at 107-08 (emphasis added)].
In Egloff v. New Jersey Air Nat. Guard, 684 F. Supp. 1275, 1282 (D.N.J. 1988), the court concluded that Jorden applies to state claims, reasoning as follows:
They argue that the legal and logical underpinnings of Jorden suggest its application to suits for damages brought under state law.
We are inclined to agree. In addition to bringing federal civil rights actions against his superiors in the Pennsylvania Air National Guard, the plaintiff in Jorden also asserted "a pendant state common law claim of defamation." 799 F.2d at 102. The Third Circuit dismissed this cause of action, "in light of the recent decisions of the [Supreme] Court restricting the availability of damage actions against the military." Id. at 108, n. 12. Specifically, the Jorden court was referring to the Supreme Court's decision in Chappell v. Wallace, 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983). There, the Supreme Court stated:
The special nature of military life  the need for unhesitating and decisive action by military officers and equally disciplined responses by enlisted personnel  would be undermined by a judicially created remedy exposing officers to personal liability at the hands of those they are charged to command. Here, ... we must be "concern[ed] with the disruption of `[t]he peculiar and special relationship of the soldier to his superiors' that might result if the solder were allowed to hale his superiors into Court"
462 U.S. at 304, 103 S.Ct. at 2367, quoting Stencel Aero Engineering Corp. v. United States, 431 U.S. 666, 676, 97 S.Ct. 2054, 2060, 52 L.Ed.2d 665 (1977). Additionally, the court in Jorden was aware, as are we, of an earlier Third Circuit case, Jaffee v. United States, 663 F.2d 1226 (3d Cir. 1981) (en banc), cert. denied, 456 U.S. 972, 102 S.Ct. 2234, 72 L.Ed.2d 845 (1982), which held that the established doctrine of military immunity precluded state causes of action against federal military officers, because "[s]uits founded on state law have the same potential for undermining military discipline as federal tort claims." 663 F.2d at 1239.
Consistency with these authorities, we believe, requires the court to hold that plaintiffs' damages claims against their Air National Guard founded upon state law for actions which allegedly transpired while plaintiffs were participants in military training pursuant to Title 32 of the United States Code are barred by the military immunity doctrine. Accordingly, plaintiffs' outstanding pendant state law actions against the individual defendants are dismissed. [Id. at 1282-83].
We are convinced that the reasoning of the federal courts upholding the doctrine of military immunity has important *130 application here. Accord Phillips v. State Dep't of Defense, 98 N.J. 235, 248, 486 A.2d 318 (1985) ("As a general proposition officers who, within the scope of their duty, direct soldiers are not liable to them for resultant injuries.") The statements of a superior officer uttered during the course of exercising official functions or duties should not be subjected to review and imposition of liability based upon mere inferences that might suggest ill-will or intentional violations of privacy rights. Cf. id. To permit such official activities to be subjected to civilian scrutiny and claims for damages on a case-by-case basis would threaten military discipline and place in jeopardy the public's right to be adequately protected by its militia. Accord Jorden, 799 F.2d at 107-08.
Plaintiff also argues that his complaint stated valid § 1983 claims against all defendants that should not have been dismissed. He urges that the trial court's conclusion that because the Guard only implemented United States Army regulations it did not violate either state law or the State or Federal Constitutions was erroneous. Plaintiff urges that even if the Guard is an alter ego of the State for the purpose of immunizing the Guard from damage claims, claims for injunctive relief remain viable.
We first note that Counts VI and VII, which concern § 1983 violations of constitutional rights, address only the "Guard." Although those counts specifically incorporate "paragraphs 2 through 6, inclusive, and, 9 through 13, inclusive, and 24" of the complaint, these enumerated paragraphs do not include allegations against defendant Vuinovich, but only allege violations by "the Guard, operating under color of state law[.]"
Title 42 of the United States Code, § 1983, provides:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress. For *131 the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia. [42 U.S.C. § 1983 (1976) (emphasis added)].
In Will v. Michigan Dep't of State Police, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), the United States Supreme Court examined the issue of "whether a State, [specifically the Department of State Police] or an official of the State while acting in his or her official capacity is a `person' within the meaning of ... 42 U.S.C. § 1983." Id. at 60, 109 S.Ct. at 2305, 105 L.Ed.2d at 50-51 (Emphasis added). The Supreme Court held that a state and its officials are not persons for purposes of imposing liability under § 1983. Id. at 71, 109 S.Ct. at 2311-12, 105 L.Ed.2d at 58. The Court observed:
[T]he intent of Congress to provide a remedy for unconstitutional state action does not without more include the sovereign States among those persons against whom § 1983 actions would lie. Construing § 1983 as a remedy for "official violation of federally protected rights" does no more than confirm that the section is directed against state action  action "under color of" state law. It does not suggest that the State itself was a person that Congress intended to be subject to liability.
... We find nothing substantial in the legislative history that leads us to believe that Congress intended that the word "person" in § 1983 included the States of the Union. And surely nothing in the debates rises to the clearly expressed legislative intent necessary to permit that construction. [Id. at 68-69, 109 S.Ct. at 2310, 105 L.Ed.2d at 56].
We conclude that neither the State of New Jersey nor the Guard can be sued for damages in a § 1983 action as the Guard is an alter ego of the State and both must be deemed not to be "persons" within the meaning of § 1983. Id.; see Hilliard v. New Jersey Army Nat'l Guard, 527 F. Supp. 405, 409 (D.N.J. 1981). In Will, the Court concluded that the Michigan State Police and the State of Michigan were not "persons" within the meaning of § 1983. Will, 491 U.S. at 71, 109 S.Ct. at 2311-12, 105 L.Ed.2d at 58. Will, therefore, "establishes that the State and arms of the State, which have traditionally enjoyed Eleventh Amendment immunity, are not subject to suit under § 1983 in either federal court or state court." Howlett v. Rose, 496 U.S. 356, ___, 110 S.Ct. 2430, 2437, 110 L.Ed.2d 332, 346 (1990) (Emphasis added). Federal courts have traditionally *132 afforded eleventh amendment immunity to state national guard units and national guard officers. Meadows v. State of Ind., 854 F.2d 1068 (7th Cir.1988) (holding that § 1983 suit by former members of Indiana National Guard barred by eleventh amendment); Hefley v. Textron, Inc., 713 F.2d 1487, 1493 (10th Cir.1983) (Kansas Army National Guard was an arm of the state which is entitled to eleventh amendment immunity); Ramsey v. Textron, Inc., 577 F.2d 1163, 1164 (4th Cir.1978) (claims against the Commonwealth and the Virginia National Guard are barred by the eleventh amendment); Tiggett v. New Jersey Nat'l Guard, 1990 WL 181474, 1, 5 (E.D.Pa. Nov. 20, 1990) (holding that eleventh amendment bars former guardsmen's claims against New Jersey National Guard for federal and state claims); Hilliard v. New Jersey Army Nat'l Guard, 527 F. Supp. at 409 (D.N.J. 1981) (National Guard member could not bring action against National Guard for civil rights violations since action is barred by the eleventh amendment). We recognize that eleventh amendment protection has no applicability to actions brought in state courts; however, the relationship between a state and its agencies remains the same. See Hefley, 713 F.2d at 1493 (specifically holding that the Kansas National Guard "is an arm of the state...."). Accord Henry v. Textron, Inc., 577 F.2d 1163, 1164 (4th Cir.), cert. denied, 439 U.S. 1047, 99 S.Ct. 722, 58 L.Ed.2d 705 (1978).
Plaintiff also seeks relief under the New Jersey Law Against Discrimination (NJLAD). Citing the holding in Phillips v. State of N.J., Dep't of Defense, 98 N.J. 235, 486 A.2d 318 (1985), plaintiff urges that the Guard, for purposes of the NJLAD (N.J.S.A. 10:5-5), should be considered a covered "employer." Plaintiff's claim is that he was discriminated against because of his handicap, i.e., testing HIV positive.
N.J.S.A. 10:5-4.1 states:
10:5-4.1. Presently or previously handicapped person; application of act
All of the provisions of the act to which this act is a supplement shall be construed to prohibit any unlawful discrimination against any person because such person is or has been at any time handicapped or any unlawful *133 employment practice against such person, unless the nature and extent of the handicap reasonably precludes the performance of the particular employment.
A person suffering from AIDS may well be considered handicapped within the meaning of the NJLAD. See Poff v. Caro, 228 N.J. Super. 370, 549 A.2d 900 (Law Div. 1987). However, even if plaintiff is considered handicapped within the definition of "physically handicapped" under the NJLAD, and even if Guard members are "employees" under the NJLAD, we nonetheless are convinced that plaintiff's claim under the NJLAD must fail.
Plaintiff's discharge and transfer from active duty to the standby reserve was compelled by Department of the Army Regulation 600-110. The Guard, as part of the United States Military, was required to take the very action complained of by plaintiff. See 10 U.S.C. § 311; Perpich v. Department of Defense, 496 U.S. 334, ___, 110 S.Ct. 2418, 2428, 110 L.Ed.2d 312, 330 (1990). See also N.J.S.A. 38A:1-6. Further, not only the Guard, but also the courts of this State would be powerless to prevent the defendants from acting in accordance with the federal regulation concerning HIV testing as such state court action would violate the Supremacy Clause of the U.S. Const. art. VI, cl. 2. Howlett v. Rose, ___ U.S. at ___, 110 S.Ct. at 2437-38, 110 L.Ed.2d at 347 (the Supremacy Clause forbids state courts from ignoring federal law because of disagreement with its content and "charges state courts with a coordinate responsibility to enforce [federal] law....") Cf. State v. Pleva, 203 N.J. Super. 178, 190, 496 A.2d 375 (App.Div.), certif. denied, 102 N.J. 323, 508 A.2d 203 (1985) (holding "it is well-established that federal laws and constitutional provisions are binding on state courts and are subject to their judicial notice."); First Jersey Securities, Inc. v. S.E.C., 194 N.J. Super. 284, 297, 476 A.2d 861 (App.Div. 1984), appeal dismissed, 101 N.J. 208, 501 A.2d 893 (1985) (holding "that the supremacy clause bars a New Jersey court from interfering with ... federal administrative proceedings."). Plaintiff's request for state judicial intervention could only be honored if in accord with federal regulations. *134 We believe that any claims along those lines which plaintiff might have would best be addressed to the Army Regulation in an action in the federal courts.[3]
The order granting summary judgment to all defendants is affirmed.
NOTES
[1] Our examination of the viability of plaintiff's claims under the NJTCA should not be taken to mean that we concede that an action under the NJTCA is not barred by the military immunity doctrine as hereinafter discussed.
[2] N.J.S.A. 26:5C-14, granting a civil cause of action for damages, both compensatory and punitive, to those aggrieved as a result of a violation of the confidentiality provisions of the AIDS Act, was not effective until January 12, 1990.
[3] We are advised by defendants that "A.R. 600-110 has been modified by a subsequent National Guard Bureau Policy statement NGB-AD-PD-90-0027," and now provides that persons testing positive may be assigned to nondeployable slots, "i.e., positions which will not result in being sent overseas in the event of war, if such positions are available." Defendants also assert that the Guard has several times "offered the plaintiff reinstatement in a nondeployable slot ... but he has not sought reinstatement." We expect, based on these representations, that plaintiff may through administrative action obtain reinstatement.