**Thomas L. KUBE, Plaintiff,**

v.

**NEW PENN MOTOR EXPRESS, INC., et al., Defendants.**

**Civ. No. 93–0162(SSB).**

United States District Court, D. New Jersey.

Sept. 30, 1994.

Richard E. Yaskin, Evans & Yaskin, Medford, NJ, for plaintiff.

Dennis P. Blake, Brown & Connery, Westmont, NJ, Francis M. Milone, Jeffrey E. Fleming, Morgan, Lewis & Bockius, Philadelphia, PA, for defendants.

## OPINION

BROTMAN, District Judge:

Presently before the court is defendant's motion for summary judgment. For the reasons set forth below, defendant's motion is denied.

### I. *Factual and Procedural Background*

In August 1987, New Penn Motor Express ("New Penn") hired plaintiff Thomas Kube ("Kube") as a "city driver" at its Cinnaminson, New Jersey terminal. Plaintiff's Brief ("Pl. Br."), at 1; Defendant's Memorandum ("Def. Memo"), at 5. From November 1987, Kube worked as a ten-percent on-call city driver. Pl. Br., at 1; Def. Memo, at 5. This position involved driving, making pickups and deliveries, and some dock work which included loading and unloading trucks. Pl. Br., at 1; Def. Memo, at 5.

New Penn employs three principal categories of employees: (1) dock workers, (2) city drivers also known as combination employees or pick-up and delivery drivers, and (3) road drivers. Def. Memo, at 2–3. New Penn claims to maintain written job requirements for each position. *Id.* at 3. Among the requirements for the dock worker position is "the ability to move freight of all types, sizes and weights, including single cartons in excess of 100 pounds" as well as a "minimum lifting capacity of 51 pounds." *Id.* at 4. The position of city driver incorporates all of the requirements for the dock worker position as well as the ability to safely operate a tractor-trailer and the physical capacity of unloading freight. *Id.* at 3–4. The lifting requirements of city drivers vary on a daily basis depending on the type of freight being transported. *Id.* at 3. Plaintiff maintains that while he

was employed by New Penn, he was never aware of any job description or written job requirements for the position of city driver. Kube Aff. ¶ 21. Plaintiff first became aware of such job descriptions during a physical therapy session in April 1991. *Id.* at ¶ 22.

Plaintiff was employed in the capacity of ten-percent on-call city driver until December 10, 1987, when he reported that he had injured his back while unloading steel on December 4. Pl. Br., at 1–2; Def. Memo, at 5. Plaintiff was absent from work as a result of this injury until the beginning of July 1988. During this absence, Kube underwent disc surgery. Pl. Br., at 3. Plaintiff received workers' compensation benefits and a 33⅓ percent partial permanent disability award. Pl. Br., at 2; Def. Memo, at 5–6.

In April 1990, plaintiff bid for and received a full-time dock loading job. Pl. Br., at 3; Def. Memo, at 6. On July 17, 1990, plaintiff re-injured his back and once again went on a leave of absence. Pl. Br., at 3; Def. Memo, at 7. Plaintiff collected workers' compensation benefits while recuperating from his injury until October 23, 1990. Def. Memo, at 7.

Kube obtained a work release from his doctor, Dr. Mitchell, on October 8, 1990 which permitted him to return to work in a driving capacity only. Kube Aff. ¶ 9 and Exh. C attached thereto. On October 2, 1990, physical therapist David Kietrys reported that plaintiff could return to work as a dock worker or city driver as long as the employer limited his duties and instituted restrictions on the amount of weight lifted. Defendant's Exhibit ("Def. Exh.") A, part 3. On November 20, 1990, Dr. Edward LaVoice examined plaintiff and concluded that there is no necessity for further treatment of plaintiff and that plaintiff "could return to work as a Truck Driver, but in view of his past medical history, I would suggest restriction of heavy lifting, such as required by Dock Worker." Def. Exh. A, part 5. Plaintiff attempted to return to work both as a city driver and a road driver. Pl. Br., at 3.

Plaintiff's October request to return to work as a road driver was denied by Regional Manager John Mahon ("Mahon") and Vice

President of Safety and Personnel Andy Kerlik ("Kerlik"). Plaintiff requested to be placed on the bottom of the road driver seniority list.[1] Kube Aff. ¶ 11; Kube Dep. attached as Def. Exh. C, at 101; Kerlik Dep. attached to Yaskin Certification as Exh. C, at 146. He was told that workers were never permitted to transfer from one seniority list to the other, that he could not perform in the road driver capacity because it required some lifting, and that defendant did not offer "light duty" work. Pl. Br., at 4; Def. Memo, at 8–9. Furthermore, Kerlik told Kube to look for another line of work and to leave New Penn alone since Kube had already received almost $70,000 from workers' compensation. Kube Aff. ¶ 12. Defendant additionally maintains that it refused to employ Kube as a road driver because of his poor job performance, poor attendance record and his poor driving record. Def. Memo, at 9.

Kube's union brought a grievance on his behalf against New Penn for its refusal to transfer him to the road driver list. This grievance was denied. Pl. Br., at 5; Def. Memo, at 10. Kube maintains that the terms of the collective bargaining agreement do not address the issue of transfer between seniority lists. Kube Aff. ¶ 13. Kube has also identified another New Penn employee who was permitted to transfer from the city driver to the road driver list. Kube Aff. ¶ 24.

Kube continuously maintained his physical certifications which met the requirements that the Department of Transportation ("DOT") prescribed for his job position. Pl. Br., at 6; actual certification forms attached to Kube Aff., Exh. D. DOT certifications are valid for a period of two years, and recertification is required after a long absence caused by injury. Pl. Br., at 6. Kube believed that New Penn's regular procedure was to schedule a recertification exam following the injured employee's return to work, as had been done following Kube's first injury. *Id.* Kube was recertified following his second injury on December 17, 1990. Kube Aff., Exh. D.

On May 17, 1991, plaintiff again sought to return to work, but this time as a city driver. Pl. Br., at 7; Def. Memo, at 10. Plaintiff offered Dr. Mitchell's new work release permitting him to return to full duty. Kube Aff., Exh. E. In a letter dated June 5, 1991, Dr. Mitchell explained to Kerlik that a functional capacity evaluation had been performed, that plaintiff had regained strength and that he could return to his job duties. Kube Aff., Exh. E. A second medical evaluation obtained from the company physician, Dr. Tocoukjou, revealed that plaintiff was medically approved, concluded that plaintiff could drive for 5–6 hours at a time, and recommended that plaintiff avoid repetitive weight lifting due to history of back surgery even though he was capable of lifting up to 100 pounds during physical therapy. Def. Exh. A, part 7. New Penn refused to reinstate plaintiff on the basis of these medical evaluations, claiming that plaintiff's lifting restrictions would prevent him from performing all the duties of a city driver. Def. Memo, at 11.

Pursuant to his rights under the collective bargaining agreement, plaintiff sought to obtain a third medical opinion by a doctor selected by Doctors Mitchell and Tocoukjou. On August 7, 1991, Dr. Bruce Heppenstall concluded that although "the physical requirements for a dock worker and a pick-up and deliver driver [same as city driver] are identical," Kube "is able to return back to work as a pick-up and delivery driver but I feel that the patient is unable to return back to full, active, unrestricted employment as a dock worker." Yaskin Certification, Exh. F. Dr. Heppenstall later explained in his deposition that plaintiff could not return to work as dock worker, but could return as a city driver because the position of dock worker involved continuous lifting throughout the day, while a city driver position involved lifting as well as driving. Heppenstall Dep., *Id.* at 33, 41. However, Dr. Heppenstall also testified in his deposition that if he had understood that the job requirements for dock worker and city driver were identical, he would not have certified Kube as capable of returning

---

**1.** New Penn maintained two separate seniority lists, one for dock workers and city drivers, the other for road drivers. Plaintiff did not ask that his seniority on the dock workers-city drivers list be transferred to the road drivers seniority list.

to work as a city driver. Heppenstall Dep., Def. Exh. E, at 17, 22, 23. On the basis of Dr. Heppenstall's report, New Penn refused to permit plaintiff to return to work as a city driver. Def. Memo, at 12.

Plaintiff pursued a second grievance under the collective bargaining agreement complaining of New Penn's refusal to reinstate him as a city driver. This grievance action concluded in a December 3, 1991 decision in favor of New Penn determining that plaintiff was not fully qualified for the position of city driver. *Id.* The decision additionally provided that plaintiff could only return to work with an unqualified release from an impartial doctor. Def. Exh. D, part 6.

Upon learning that plaintiff had held a position as a truck driver for another employer, on September 14, 1992, defendant presented to plaintiff an unconditional offer to return to work at New Penn. Def. Memo, at 14. In the offer letter, Kerlik asked plaintiff to contact him "immediately to discuss [his] ... return to work and any reasonable accommodation which will be necessary" as well as any "alternate position as part of the company's attempt to reasonably accommodate" plaintiff as required by the Americans With Disabilities Act and the New Jersey Law Against Discrimination ("NJLAD"). Kube Aff. Exh. F. Following Kube's October 8, 1992 DOT recertification examination, Kerlik offered Kube the option to return to work on October 12. See Kerlik's October 9, 1992 letter at *Id.* Kube declined Kerlik's offer because it did not meet his request for retroactive benefits. Pl. Br., at 11.

Plaintiff filed suit on October 6, 1992 in the Superior Court of New Jersey, Camden County, alleging that New Penn violated the NJLAD when it discriminated against him on the basis of his handicap by refusing to reinstate plaintiff after a back injury which limited his ability to lift freight. Plaintiff also alleged a cause of action for violation of public policy. On January 6, 1993, defendant removed the suit to this Court alleging that plaintiff's claims were pre-empted by § 301 of the Labor Management Relations Act ("LMRA"). On December 23, 1993, plaintiff amended his complaint to include a claim of retaliatory discharge for collecting workers'

compensation benefits. Defendant has moved for summary judgment on all of plaintiff's claims.

## II. *Discussion*

### A. *Summary Judgment Standard*

■ The standard for granting summary judgment is a stringent one. A court may grant summary judgment only when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Hersh v. Allen Prods. Co.,* 789 F.2d 230, 232 (3d Cir.1986); *Lang v. New York Life Ins. Co.,* 721 F.2d 118, 119 (3d Cir.1983). In deciding whether there is a disputed issue of material fact the court must view all doubt in favor of the non-moving party. *Meyer v. Riegel Prods. Corp.,* 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. denied,* 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984); *Smith v. Pittsburgh Gage & Supply Co.,* 464 F.2d 870, 874 (3d Cir.1972). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

■ Supreme Court decisions mandate that "a motion for summary judgment must be granted unless the party opposing the motion can produce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." *J.E. Mamiye & Sons, Inc. v. Fidelity Bank,* 813 F.2d 610, 618 (3d Cir.1987) (Becker, J., concurring) (citing *Anderson,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Moreover, once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89

L.Ed.2d 538 (1986). Thus, if the non-movant's evidence is merely "colorable" or is "not significantly probative," the court may grant summary judgment. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511.

B. *Pre-emption by § 301 of the LMRA*

1. *Plaintiff's Handicap Discrimination Claim*

■ Defendant contends that plaintiff's claim for handicap discrimination under the NJLAD, N.J.S.A. 10:5–4.1, is pre-empted by § 301 of the LMRA because analysis of such claim is intertwined with the parties' rights under the collective bargaining agreement. For the reasons set out below, this Court rejects defendant's argument.

The Supreme Court has firmly established that state court actions alleging violations of labor contract provisions must be brought under § 301 of the LMRA and be decided under federal law. *Teamsters v. Lucas Flour Co.,* 369 U.S. 95, 103–04, 82 S.Ct. 571, 576–77, 7 L.Ed.2d 593 (1962). Furthermore, in the interest of "uniform federal interpretation" of collective bargaining agreements, the Supreme Court determined that "questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort." *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 211, 105 S.Ct. 1904, 1911, 85 L.Ed.2d 206 (1985). In *Lueck,* the Court found that plaintiff's state law tort claim of bad faith was pre-empted by § 301 of the LMRA because the state claim was both derived from and defined by the collective bargaining agreement and analysis of this claim would inevitably involve interpretation of the agreement. *Id.* at 218, 105 S.Ct. at 1914–15.

■ However, *Lueck* emphasized that "not every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is pre-empted by

§ 301 or other provisions of the federal labor law." *Id.* at 211, 105 S.Ct. at 1911. The Supreme Court explained that

> [c]learly, § 301 does not grant the parties to a collective-bargaining agreement the ability to contract for what is illegal under state law. In extending the pre-emptive effect of § 301 beyond suits for breach of contract, it would be inconsistent with congressional intent under that section to pre-empt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract.

*Id.* at 212, 105 S.Ct. at 1911–12. It is only when the resolution of the state law claim is intertwined with an analysis of the terms of the collective bargaining agreement that such claim is pre-empted by federal law.[2] *Id.* at 220, 105 S.Ct. at 1915–16; *Berda v. CBS, Inc.,* 881 F.2d 20, 23 (3d Cir.1989), *cert. denied,* 493 U.S. 1062, 110 S.Ct. 879, 107 L.Ed.2d 962 (1990); *Malia v. RCA Corp.,* 794 F.2d 909, 911–12 (3d Cir.1986), *cert. denied,* 482 U.S. 927, 107 S.Ct. 3210, 96 L.Ed.2d 696 (1987); *Leonardis v. Burns Int'l Sec. Services, Inc.,* 808 F.Supp. 1165, 1174–75 (D.N.J. 1992).

Defendant contends that plaintiff's claim for handicap discrimination "is inextricably intertwined with the parties' rights under the collective bargaining agreement" and is therefore pre-empted by § 301 of the LMRA. Def. Memo. at 17–18, 19. Defendant argues that because the collective bargaining agreement sets forth a provision enabling the employer to establish an optional "modified work program", because the agreement permits the employer to require an employee to undergo a medical examination to determine whether the employee is capable of performing the job, and because the agreement provides that in the event of an injury the employee's ability to perform his job will be determined by a medical report, the parties to the contract have agreed that the collective bargaining agreement shall control the determination of whether an employee has the capacity to perform his job. *Lueck,* 471 U.S. at 220, 105 S.Ct. at 1915–16.

**2.** This rule promotes the central tenet of federal labor-contract law that the arbitrator, not the court, should be responsible for interpreting the collective bargaining agreement. *Lueck,* 471 U.S. at 220, 105 S.Ct. at 1915–16.

Defendant's Reply Memorandum ("Def. Reply"), at 4–7.

■ Plaintiff's claim is based on section 10:5–4.1 of the NJLAD which prohibits discrimination and unlawful employment practices against any person on the grounds that such person is or has been handicapped. N.J.S.A. 10:5–4.1 (West 1993). Furthermore, the New Jersey Administrative Code provides that "[a]n employer must make a reasonable accommodation to the limitations of a handicapped employee or applicant, unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of its business." N.J.A.C. 13:13–2.5(b) (1994). A handicapped employee establishes a *prima facie* case of discriminatory discharge by proving "(1) that he was [handicapped within the meaning of the law], (2) that he was performing his job at a level that met his employer's legitimate expectations [and that the handicap did not unreasonably hinder his job performance], (3) that he nevertheless was fired, and (4) that the [employer] sought someone to perform the same work after he left." *Jansen v. Food Circus Supermarkets, Inc.,* 110 N.J. 363, 382, 541 A.2d 682 (1988) (citations omitted); *Maher v. New Jersey Transit Rail Operations, Inc.,* 125 N.J. 455, 480–81, 593 A.2d 750 (1991). Once the employee establishes his *prima facie* case, the employer must then demonstrate either the reasonableness of the otherwise discriminatory act or establish a non-discriminatory reason for the employee's discharge.[3] *Jansen,* 110 N.J. at 382, 541 A.2d 682; *Maher,* 125 N.J. at 481, 593 A.2d 750.

In the present case, the collective bargaining agreement is neither the source of the plaintiff's claim, nor a document that needs to be consulted to resolve plaintiff's cause of action. The procedures established by the collective bargaining agreement for requiring medical examinations of employees and permitting the employer to rely on such examinations to determine employee capacity to perform the job are irrelevant to the resolution of plaintiff's claim. Plaintiff does not question the propriety of such procedures. Furthermore, it is only the actual substance of the doctors' reports obtained through these procedures that is needed for the resolution of plaintiff's handicap discrimination claim.

With regard to the modified work program provision of the collective bargaining agreement, defendant itself admits that implementation of such an accommodation program for injured employees shall be at the employer's option. *See* Def. Reply, at 5; Yaskin Certification, Exh. G, Art. 14, § 2. As a result, there is not an actual provision in the collective bargaining agreement which puts into effect a plan for accommodating handicapped employees. Also, defendant has not alleged that any accommodation program has actually been implemented pursuant to the collective bargaining agreement or that plaintiff's handicap was evaluated pursuant to any such program. Consequently, reference to the collective bargaining agreement is not necessary.

In fact, even if the collective bargaining agreement had incorporated some sort of modified work program, defendant still could not escape the obligations established by the NJLAD. The United States Supreme Court, in *Lingle v. Norge Division of Magic Chef, Inc.,* has stated that with regard to antidiscrimination laws,

> the mere fact that a broad contractual protection against discriminatory ... discharge may provide a remedy for conduct that coincidentally violates state law does not make the existence or the contours of the state-law violation dependent upon the terms of the private contract. For even if an arbitrator should conclude that the contract does not prohibit a particular discriminatory ... discharge, that conclusion might or might not be consistent with a proper interpretation of state law.

*Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 412–13, 108 S.Ct. 1877, 1885, 100 L.Ed.2d 410 (1988). Furthermore, the New Jersey Supreme Court, relying on the New Jersey Administrative Code, has determined

---

**3.** If the employer defends by arguing that it reasonably determined that plaintiff's handicap precluded him from performing his job, the burden of proof shifts to the employer once the employee establishes his *prima facie* case. *Jansen,* 110 N.J. at 383, 541 A.2d 682.

that an employer's decision to terminate a handicapped employee because of his handicap requires "an objective standard supported by *factual or scientifically validated evidence,* rather than ... general assumptions that a particular handicap would create a hazard" to the employee or to others. *Jansen,* 110 N.J. at 378, 541 A.2d 682 (quoting N.J.A.C. 13:13–2.8(a)(2)) (emphasis added). Whether the employer has failed to make a reasonable accommodation for a handicapped employee is to be determined on a case-by-case basis. N.J.A.C. 13:13–2.5(b). Consequently, the outcome of plaintiff's discrimination claim will depend on the actual events which transpired between plaintiff and defendant, and not on the meaning of any provisions of the collective bargaining agreement. "[E]ven if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes." *Lingle,* 486 U.S. at 409–10, 108 S.Ct. at 1883.

Following *Lingle,* there is significant support for the position that state anti-discrimination laws are not pre-empted by § 301 of the LMRA. In *Carrington v. RCA Global Communications, Inc.,* Judge Debevoise, United States District Court for the District of New Jersey, held that "state law discrimination claims under the NJLAD are derived independently from state law, and not from the obligations assumed by the parties under the labor agreement" and thus are not pre-empted by § 301 of the LMRA. *Carrington v. RCA Global Communications, Inc.,* 762 F.Supp. 632, 641–42 (D.N.J.1991). Other courts have determined that state law rights of employees "not to be discriminated against

because of physical handicap or medical condition ... [are] defined and enforced under state law without reference to the terms of any collective bargaining agreement," even where the agreement itself disallows discrimination. *Ackerman v. Western Elec. Co., Inc.,* 860 F.2d 1514, 1517 (9th Cir.1988); *see also Smolarek v. Chrysler Corp.,* 879 F.2d 1326, 1334 (6th Cir.), *cert. denied,* 493 U.S. 992, 110 S.Ct. 539, 107 L.Ed.2d 537 (1989) (claim for discrimination on the basis of a handicap involves purely factual questions concerning employer's behavior and motivation; interpretation of the collective bargaining agreement is not required); *Miller v. AT & T Network Sys.,* 850 F.2d 543, 547 (9th Cir.1988) (if mere overlap between mandatory state anti-discrimination provisions and labor contracts resulted in pre-emption of the state law, then § 301 would improperly govern the substance of what parties could agree to in a labor contract).[4]

Defendant culminates its pre-emption argument with the proposition that "the union and employer have agreed to supplant *entirely,* as they are permitted to do, state law and regulations on the issues of whether an employee is physically capable of performing his job, whether the employer has an obligation to accommodate an employee's physical disability, and whether the employer is somehow discriminating against an employee because he has filed a worker's compensation claim." Def. Reply, at 7 (emphasis in original).

By making such an argument, defendant completely ignores the teachings of the Supreme Court in *Lueck.* The Court expressly stated that there is no indication that Congress, "in adopting § 301, wished to give the substantive provisions of private agreements the force of federal law, ousting any inconsis-

---

**4.** Defendant offers *Davis v. Johnson Controls, Inc.,* 21 F.3d 866 (8th Cir.1994) in support of its proposition that resolution of plaintiff's discrimination claim will involve the interpretation of the collective bargaining agreement and must, for this reason, be pre-empted by federal labor law. However, defendant fails to notice an important factor which distinguishes *Davis* from the present case. *Davis* relied on the Missouri Code of State Regulations which provides that in determining the reasonableness of an accommodation of a handicapped employee, a factor to be con-

sidered is whether the terms of the collective bargaining agreement authorize the employer to make such an accommodation. *Id.* at 868. The NJLAD and the New Jersey Administrative Code contain no comparable provision. In fact, the New Jersey Administrative Code provides that "[r]egulations promulgated pursuant to the Law Against Discrimination shall supersede any inconsistent term of a collective bargaining agreement." N.J.A.C. 13:13–2.6(d). Consequently, *Davis* is not controlling in the present case.

tent state regulation." *Lueck*, 471 U.S. at 212, 105 S.Ct. at 1911. *Lueck* was clear on the fact that § 301 does not permit the parties to a collective bargaining agreement to contract for terms which are illegal under state law. *Id.* "[N]otwithstanding the strong policies encouraging arbitration, 'different considerations apply *where the employee's claim is based on rights arising out of a statute designed to provide minimum substantive guarantees to individual workers.'*" *Lingle*, 486 U.S. at 412, 108 S.Ct. at 1884 (citations omitted). In fact, "Congress expressly contemplated that the states would exercise their traditional regulatory powers to prohibit employment discrimination." *United States v. City of Philadelphia*, 798 F.2d 81, 86 n. 5 (3d Cir.1986); *Carrington*, 762 F.Supp. at 641. "Absent a conflict with federal law, therefore, state discrimination laws are also not preempted by federal labor law because 'the regulated conduct ... touches interests so deeply rooted in local feeling and responsibility that the court cannot infer that Congress intended to deprive the States of the power to act.'" *Carrington*, 762 F.Supp. at 641–42 (quoting *Sargent v. Int'l Bhd. of Teamsters*, 713 F.Supp. 999, 1014 (E.D.Mich.1989)).

Consequently, this Court rejects defendant's contention that plaintiff's state law discrimination claim is pre-empted by § 301 of the LMRA.[5]

### 2. *Plaintiff's Claim of Retaliatory Discharge for Collecting Workers' Compensation*

Defendant also argues that plaintiff's claim of retaliatory discharge for collecting workers' compensation in violation of N.J.S.A. 34:15–39.1 (West 1988) is pre-empted by § 301 of the LMRA because resolution of such claim will require the interpretation of the collective bargaining agreement.

In order to establish "a *prima facie* case for retaliatory discharge the employee must prove: (1) that he made or attempted to make a claim for workers' compensation; and (2) that he was discharged in retaliation for making that claim." *Cerracchio v. Alden Leeds, Inc.*, 223 N.J.Super. 435, 442–43, 538 A.2d 1292 (1988) (quoting *Galante v. Sandoz, Inc.*, 192 N.J.Super. 403, 407, 470 A.2d 45 (Law Div.1983), *aff'd*, 196 N.J.Super. 568, 483 A.2d 829 (App.Div.1984)). The employer must then demonstrate that the employee was discharged for another, non-pretextual reason. *Lepore v. Nat'l Tool & Mfg. Co.*, 224 N.J.Super. 463, 473, 540 A.2d 1296, *aff'd*, 115 N.J. 226, 557 A.2d 1371 (1988), *cert. denied*, 493 U.S. 954, 110 S.Ct. 366, 107 L.Ed.2d 353 (1989). The fact that the employee is also covered by a collective bargaining agreement does not preclude an action for retaliatory discharge which is predicated on an independent state basis. *Lepore*, 115 N.J. at 228, 557 A.2d 1371.

The Supreme Court's decision in *Lingle v. Norge Division of Magic Chef, Inc.* is controlling here. There, the Supreme Court held that the Illinois state law tort of retaliatory discharge for filing a workers' compensation claim is not pre-empted by § 301 of the LMRA. *Lingle*, 486 U.S. at 407, 108 S.Ct. at 1882. The Court determined that the elements of the tort of retaliatory discharge under Illinois law are "purely factual questions pertain[ing] to the conduct of the employee and the conduct and motivation of the employer." *Id.* Neither the elements of this cause of action, nor the available defenses, require the interpretation of the collective bargaining agreement. *Id.*

The elements of a claim for retaliatory discharge for collecting workers' compensation benefits under New Jersey law closely

---

**5.** This Court has given serious consideration to defendant's contention that plaintiff's discrimination claim is pre-empted by § 301 to the extent it is based on New Penn's refusal to transfer him to the road driver seniority list. Although defendant argues that transfer between the company's seniority lists is governed by the provisions of the collective bargaining agreement, defendant has failed to produce the pertinent provisions for the court's review. Finding the record lacking of any hard evidence on this issue, and viewing all doubt in favor of the non-moving party, the Court finds that plaintiff's discrimination claim is not pre-empted by § 301 of the LMRA. *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. denied*, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984); *Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir. 1972).

mirror the elements required under the Illinois tort discussed in *Lingle.* Thus, resolution of the retaliatory discharge claim under New Jersey law would require a purely factual inquiry which does not depend upon the meaning of any terms in the collective bargaining agreement. *See id.* Since "the state law cause of action is concerned not with the employer's contractual right to discharge the employee, but rather with its motives in exercising that right, the . . . [collective bargaining agreement] is not relevant and pre-emption does not apply." *Jarvis v. Nobel/Sysco Food Services Co.,* 985 F.2d 1419, 1427 (10th Cir.1993). Even if the employer's non-retaliatory explanation for the discharge depends on its interpretation of the collective bargaining agreement, "[s]o long as this interpretation was made in good faith and actually motivated . . . [the employer's] actions," it constitutes a valid defense "without regard to the correctness of the interpretation." *Id. See also Jones v. Roadway Express, Inc.,* 936 F.2d 789, 792 (5th Cir.1991) (court need only determine the factual question of whether employer's discharge of employee was motivated by the filing of a workers' compensation claim or an alternative motive; whether motive is justified by the collective bargaining agreement is irrelevant if retaliation was not a motive). Consequently, this Court concludes that plaintiff's retaliatory discharge claim does not require the interpretation of any provisions of the collective bargaining agreement, and as a result, is not pre-empted by § 301 of the LMRA.

Defendant argues that not all workers' compensation claims under state law can escape the pre-emptive effect of § 301 and cites a number of post-*Lingle* cases in support. However, the cases cited by defendant are distinguishable from the case at hand. In *Medrano v. Excel Corp.,* plaintiff's wrongful discharge claim was pre-empted by § 301 of the LMRA because plaintiff's claim specifically challenged a provision of the collective bargaining agreement. *Medrano v. Excel Corp.,* 985 F.2d 230, 233–34 (5th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 79, 126 L.Ed.2d 47 (1993). In *Magerer v. John Sexton & Co.,* the First Circuit found that plaintiff's retaliatory discharge claim was pre-empted by § 301 because the Massachusetts

statute expressly provided that the terms of the collective bargaining agreement are to prevail over inconsistent statutory provisions. *Magerer v. John Sexton & Co.,* 912 F.2d 525, 529 (1st Cir.1990). The Sixth Circuit, in *Terwilliger v. Greyhound Lines, Inc.,* found pre-emption because plaintiff's state law claim of fraud and misrepresentation was in effect a claim that the employer violated the terms of the collective bargaining agreement. *Terwilliger v. Greyhound Lines, Inc.,* 882 F.2d 1033, 1037–38 (6th Cir.1989), *cert. denied,* 495 U.S. 946, 110 S.Ct. 2204, 109 L.Ed.2d 531 (1990). In *Doran v. Thermatex,* plaintiff's termination claim was pre-empted because it was based on the allegation that the employer had incorrectly interpreted the collective bargaining agreement. *Doran v. Thermatex,* No. C88–873Y, 1989 WL 163700, at *3 (N.D. Ohio July 31, 1989). Finally, the claim in *Robinson v. Cushman, Inc.* did not involve workers' compensation retaliation. Plaintiff's claim alleged "that he was discharged without just cause and due process while on workers' compensation disability in violation of Nebraska public policy." *Robinson v. Cushman, Inc.,* 242 Neb. 830, 496 N.W.2d 923, 926 (1993). Since the cases cited by defendant in support of its pre-emption argument are inapplicable to the case at hand, this Court rejects defendant's contention that plaintiff's workers' compensation retaliation claim is pre-empted by § 301 of the LMRA.

### C. *Pre-emption by the Federal Motor Carrier Safety Regulations*

Defendant argues that plaintiff's handicap discrimination and workers' compensation retaliation claims are pre-empted by the Federal Motor Carrier Safety Regulations, 49 C.F.R. §§ 391.41–49, promulgated by the DOT. For the reasons stated below, the Court rejects defendant's argument.

The pre-emption doctrine, the foundation of which is grounded on the Supremacy Clause of the U.S. Constitution, Art. VI, cl. 2, directs us to examine congressional intent. *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 152, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982). Congressional intent to pre-empt a given field may be

"explicitly stated in the [federal] statute's language or implicitly contained in its structure and purpose." *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). In the absence of explicitly pre-emptive language, a congressional intent to pre-empt can be inferred where (1) the federal scheme of regulation is so pervasive as to create a reasonable inference that Congress left no room for the states to supplement the law in the area or (2) the federal law pertains to an area in which "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state law on the same subject" or (3) the goal to be obtained by the federal law and "the character of obligations imposed by it may reveal the same purpose." *Fidelity Fed.*, 458 U.S. at 153, 102 S.Ct. at 3022 (citing and quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)).

▮▮▮▮ Federal regulations are deemed to have just as much pre-emptive effect as federal statutes. *Fidelity Fed.*, 458 U.S. at 153, 102 S.Ct. at 3022; *Pokorny v. Ford Motor Co.*, 902 F.2d 1116, 1122 (3d Cir.), *cert. denied*, 498 U.S. 853, 111 S.Ct. 147, 112 L.Ed.2d 113 (1990). "[T]here is generally a presumption against pre-emption, . . . [t]herefore, state law must create an actual conflict with a federal regulatory scheme before it is impliedly pre-empted." *Pokorny*, 902 F.2d at 1122. In instances where the federal law has not totally displaced state law, state law is nullified (1) if it conflicts with federal law, a situation which arises when compliance with both state and federal regulations is impossible, or (2) if it is an obstacle to accomplishing and executing the goals of federal law. *Fidelity Fed.*, 458 U.S. at 153, 102 S.Ct. at 3022.

Congress has given the Secretary of Transportation the power to prescribe the qualifications of the drivers who are engaged by motor carriers. 49 U.S.C.A. § 31102(b)(1) (West Supp.1994). Accordingly, DOT's Bu-

reau of Motor Carrier Safety, Federal Highway Administration, has promulgated regulations which establish the minimum physical qualifications for drivers of interstate carriers. *See* 49 C.F.R. §§ 391.1, 391.41–49 (1993). The regulations require drivers to have their certifications renewed every two years, and following a period of injury or disease which impaired the driver's ability to perform his duties. 49 C.F.R. § 391.45(b)(1), (c).

Defendant argues that plaintiff's state law claims are pre-empted because a determination of those claims would directly conflict with defendant's obligations under the federal regulations. Def. Memo, at 26. In support of its argument, defendant offers *C.J. v. Vuinovich*, 252 N.J.Super. 122, 133, 599 A.2d 548 (1991), where the New Jersey Superior Court held that a NJLAD handicap discrimination claim by a discharged member of the National Guard was pre-empted by federal law. The court explained that the Department of the Army Regulation 600–110 required the military to discharge plaintiff once he tested HIV positive. *Id.* This case does not help defendant's argument because at all relevant times, defendant was either unaware as to whether or not plaintiff was qualified under the DOT regulations, or defendant was fully aware that plaintiff had been recertified pursuant to the DOT requirements. That is, when plaintiff asked to return to work in October 1990, defendant did not know whether or not plaintiff was qualified under the DOT requirements because a recertification exam had not yet been performed.[6] On the other hand, when plaintiff asked to return to work in May 1991, defendant should have been fully aware that plaintiff was recertified pursuant to the DOT regulations on December 17, 1990. *See* Kube Aff., Exh. D. Consequently, defendant is not aided by the reasoning in *Vuinovich* because, under the circumstances, the DOT regulations did not require plaintiff's discharge.

---

6. There is sufficient evidence to support an inference that plaintiff reasonably believed that New Penn would direct him to undergo a recertification exam once he obtained his work release. Since New Penn had followed such procedure after plaintiff's first injury, plaintiff was justified in believing that a similar practice would be followed again. There exists a question of fact as to whether or not defendant had an established practice of retesting injured employees for DOT qualifications once they obtained a doctor's permission to return to work.

Defendant also relies on *Belgard v. United Airlines,* 857 P.2d 467 (Colo.Ct.App.1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 1066, 127 L.Ed.2d 386 (1994), where a Colorado court rejected a handicap discrimination claim of two applicants for pilot jobs who alleged that they were rejected because they had corrective myopia surgery. However, this case is distinguishable on two grounds. First, the airline-defendant's pre-emption claim was based on federal aviation law, not DOT regulations at issue in this case. Second, the Colorado court found that federal aviation law pre-empted plaintiffs' handicap discrimination claims because Congress had "expressed a specific intent to pre-empt the operation of state laws of this nature." *Id.* at 470. No such intent to pre-empt is expressed or implied in the DOT regulations. In fact, the regulations even provide that they are "not intended to preclude States or subdivisions thereof from establishing or enforcing State or local laws relating to safety, the compliance with which would not prevent full compliance with these regulations." 49 C.F.R. § 390.9. "[T]he federal regulatory scheme governing the physical qualifications for drivers indicates an intent on the part of Congress to occupy the field of driver regulation [only] to the extent of existing regulations." *Visnovec v. Yellow Freight Sys., Inc.,* 754 F.Supp. 142, 146 (D.Minn.1990).

In creating these regulations aimed at public safety, the DOT could not have intended to pre-empt state regulation of such important rights as the right to be protected from handicap discrimination and workers' compensation retaliation. Such important local concerns do not fall within the sphere of subject matter regulated by the DOT. The only time that a pre-emption question could possibly arise in this context is when the state statute requires conduct which prevents compliance with the DOT regulations. However, the NJLAD takes into consideration the fact that a handicap may interfere with the performance of a particular job. *See* N.J.S.A. 10:5–4.1. Thus, New Jersey law permits an employer to refuse to employ or accommodate an employee when such decision is based on objective standards, such as the Federal Motor Carrier Safety Regulations, when supported by factual evidence.

*See* N.J.A.C. 13:13–2.8(a)(1). Consequently, operation of the NJLAD does not conflict with the DOT regulations and, therefore, plaintiff's handicap discrimination claim is not pre-empted by this federal regulatory scheme.

Defendant further offers *Carolina Freight Carriers v. Commonwealth of Pennsylvania, Pennsylvania Human Relations Comm'n,* 99 Pa.Cmwlth. 428, 513 A.2d 579 (1986), *appeal denied,* 514 Pa. 620, 521 A.2d 934 (1987) in support of its pre-emption argument. In *Carolina Freight,* an employer rejected two applicants for the position of truck driver because the applicants, when examined, failed to meet the physical qualifications under the DOT regulations. *Carolina Freight,* 513 A.2d at 580–81. The applicants filed complaints with the Pennsylvania Human Relations Commission alleging handicap discrimination. The Commission found for the applicants and directed the employer to hire the applicants into the next available positions. *Id.* at 581. On appeal, the Commonwealth Court of Pennsylvania reversed the Commission's order and held that federal law pre-empted the order because compliance with the order would be impossible without also violating the DOT regulations. *Id.* at 583–84.

However, *Carolina Freight* is distinguishable because, in the case at hand, plaintiff was never found to have violated any of the DOT qualification requirements in contrast to the applicants in *Carolina Freight.* As discussed previously, at all relevant times, defendant was either unaware as to whether or not plaintiff qualified under the DOT regulations, or defendant should have been aware that plaintiff had been recertified under these regulations. Thus, at best, there exists a question of fact as to whether plaintiff met the DOT regulations when he sought reinstatement in October 1990. Defendant cannot argue that plaintiff's state law claims are pre-empted by the Federal Motor Carrier Safety Regulations because defendant cannot show that, at that time, plaintiff failed to meet the qualifications required by such regulations. When plaintiff asked to return to work in May 1991, he was fully certified, as of December 17, 1990, under the qualifications established by the DOT. *See* Kube Aff., Exh. D. Defendant's failure to rein-

state plaintiff at this time cannot be justified by its reliance on the federal regulations. Consequently, plaintiff's state law claims cannot be said to be pre-empted by these federal regulations.[7]

### D. *Remand to State Court*

This Court finds that plaintiff's state law claims are pre-empted neither by § 301 of the LMRA, nor the Federal Motor Carrier Safety Regulations. As a result, there exists no federal question in this suit and only state law claims comprise plaintiff's cause of action. Accordingly, this Court lacks subject matter jurisdiction in this case and remand to the state court is proper.[8]

### III. *Conclusion*

For the reasons set forth above, defendant's summary judgment motion is denied and the case is remanded to state court.

---

7. Since defendant cannot show that plaintiff violated the DOT qualification requirements, the DOT regulations do not pre-empt the resolution of plaintiff's state law claims. This is very different from the circumstances in *Carolina Freight* where the court overruled a determination that defendant violated the state anti-discrimination law even though the job applicants in that case failed to meet the DOT requirements.

8. Because this Court lacks subject matter jurisdiction to entertain this case, the remaining arguments that defendant raises in its motion for summary judgment will not be addressed.