Clifford PATTERSON, Plaintiff,

v.

EXXON MOBIL CORPORATION, John Thomas, David Silva, Ken Estes, Ken Sadler, Joseph Fierko, Pat Deshaw, Ken Toomey, Robert Pendaruis, Ray Dorrell, Bruce Thompson, John Does 1–10, Fictitious Names, and Richard Roe Company, a Fictitious Name (Corporation, Partnership, Limited Liability Company or Other Lawful Entity), Jointly, Severally and in the Alternative, Defendants.

Civil No. 02–cv–5719 (JBS).

United States District Court,
D. New Jersey.

May 19, 2003.

Carl D. Poplar, David E. Poplar, Cheryl L. Cooper, Poplar & Eastlack, P.C., Turnersville, NJ, for Plaintiff Clifford Patterson.

Peter L. Frattarelli, Melissa R. Lock, Archer & Greiner, P.C., Haddonfield, NJ, for Defendants Exxon Mobil Corporation, John Thomas, David Silva, Ken Estes, Ken Sadler, Joseph Fierko, Pat Deshaw, Ken Toomey, Robert Pendarvis, Ray Dorrell, Bruce Thompson, Charlie Ward, and Martin Stock.

### *OPINION*

SIMANDLE, District Judge.

In this employment discrimination and retaliation action, the Court is called upon to decide whether Plaintiff's state law claims under the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19–1, et seq., and the New Jersey Law Against Discrimination ("LAD"), N.J.S.A. § 10:5–1, et seq., are pre-empted by Section 301 of the federal Labor Management Relations Act, 29 U.S.C. § 185 ("LMRA"), which exclusively governs disputes between parties to a labor contract where a party has alleged a violation of the collective bargaining agreement ("CBA") or where the dispute at issue requires interpretation of the CBA.

Plaintiff, arguing that the preclusive reach of section 301 of the LMRA does not extend to claims brought under the LAD or under the CEPA, has moved to remand the instant matter to the Superior Court of

New Jersey, Gloucester County, in accordance with 28 U.S.C. § 1447(c). In opposition to Plaintiff's motion for remand, Defendants argue that Plaintiff's Complaint is removable to this Court as a dispute arising under federal law because Plaintiff's whistleblower and retaliation claims are "inextricably intertwined with the provisions of the CBA and, therefore, are preempted." (Def.'s Br. at 1.)

For the reasons that follow, this Court holds that section 301 of the LMRA does not pre-empt Plaintiff's state law claims here because a violation of the CBA does not form the basis of Plaintiff's action nor is the Court called upon to interpret the CBA in order to reach the merits of Plaintiff's claims. Therefore, this matter will be remanded to the New Jersey Superior Court, Gloucester County, Law Division, because this Court is without subject matter jurisdiction over plaintiff's claims.

## I. *BACKGROUND*

Plaintiff Clifford Patterson began working for Exxon Mobil Corp. (hereinafter "Exxon Mobil") in the Paulsboro, New Jersey facility in 1977 and has held various positions with the company since that time, most recently the position of "welder/hard trader maintenance mechanic" since 1992. (Compl.¶ 20.) Plaintiff, a Caucasian male, alleges that his co-workers engaged in numerous acts of discriminatory and retaliatory behavior, including but not limited to pranks, jokes and games directed at plaintiff. (*Id.* ¶¶ 4, 21.) In 1994, for example, when a job posting for "service attendant" for the maintenance department was posted for current employees to bid for the job, defendant Martin Stock, supervisor of the maintenance department, stated that the job would definitely be awarded to a white person because he would not allow any "n____" in his department. (*Id.* ¶ 22.)

Plaintiff also claims that defendants passed over the three most qualified applicants, who are of minority background, in favor of a non-minority applicant for the service attendant job in the maintenance department. (Compl.¶ 23.) Specifically, plaintiff alleges that under "ExxonMobil's own policy and the collective bargaining agreement with the union, Independent Oil Workers ('IOW'), . . . the top three qualified individuals for the position were John Lyles, Frank Morales, and Lou Lopez," an African–American and two Hispanic gentlemen, yet the position was awarded to a Caucasian gentleman. (*Id.*) To correct the apparent error, Plaintiff notified his supervisor Stock and upper management that "someone other than the top qualified candidate" was awarded the position, and he then assisted co-employee Lyles in filing a grievance. (Compl.¶ 24.)

For his part in exposing what he perceived as racially discriminatory animus in the awarding of the service attendant job, plaintiff alleges that defendants "embarked upon a course of continual harassment, retaliation, and discrimination" causing plaintiff to suffer "severe and acute emotional and psychiatric distress," for which he was placed on disability from October 18, 2000 through August 8, 2001. (Compl.¶ 25.) Plaintiff alleges he had reported to his supervisors the numerous instances of racial discrimination, including defendants' use of obscene and profane language towards his African–American co-workers, and that he had filed grievances with his union representative, including but not limited to George Wagner. (*Id.* ¶¶ 27, 28.) In addition, plaintiff alleges defendants retaliated against him and subjected him to adverse employment conditions, including subjecting plaintiff to pornographic materials and frequent racial epithets used by co-workers and supervisors. (*Id.*)

After his return from disability in 2001, plaintiff alleges he was subjected to inten-

sified harassment, intimidation, and retaliation by defendants. (*Id.* ¶ 29.) Plaintiff reported these incidents to supervisors, including the plant manager John Thomas and his union representative, although the alleged offenders were never disciplined. (*Id.* ¶¶ 29, 30.) Due to increased hostility, harassment, and retaliation, plaintiff was placed on disability again from August 2001 to April 24, 2002. (*Id.* ¶ 31.) Plaintiff allegedly remains on authorized leave due to his psychological status. (*Id.*)

On October 18, 2002, Plaintiff filed this action in the New Jersey Superior Court, Gloucester County, Docket Number L–1923–02, alleging the following claims: violations of the New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19–1, et seq. (hereinafter "CEPA") (Count I); retaliation under the New Jersey Law Against Discrimination, N.J.S.A. 10:5–1 et seq. (hereinafter "LAD") (Count II); aiding and abetting under the LAD (Count III); hostile work environment under the LAD (Count IV); and intentional infliction of emotional distress (Count V). (Compl. ¶¶ 1–109.) Plaintiff pleads Count VI against Richard Roe Company in the event it is determined that another entity is the actual employer of plaintiff, and Count VII against John Does 1–10 in the event that additional individuals were engaged in the alleged unlawful actions, and seeks joint and several liability in Count VIII. (Compl. ¶¶ 110–14.)

On December 2, 2002, Defendants removed the matter to federal court, pursuant to 28 U.S.C. § 1441(a), on the basis of Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (hereinafter "LMRA"), and federal question jurisdiction pursuant to 28 U.S.C. § 1331. (Notice of Removal, 12/2/02, ¶¶ 3(i), 4(d).) Defendants assert that removal is proper because in order to resolve plaintiff's state CEPA claim asserted in Count I, the Court must determine whether defendant

Exxon Mobil breached the CBA by failing to award the service attendant position to a minority employee and/or by failing to promote plaintiff to a position in the safety department. (*Id.* ¶ 3(g).) Defendants also assert that in order to resolve plaintiff's LAD claim in Count II, the Court must determine whether Exxon Mobil breached the CBA pursuant to the allegations in Count I, and by its alleged failure to award plaintiff a job promotion. (*Id.* ¶ 4(c).) Plaintiff filed this motion for remand on December 20, 2002, arguing that his claims are not preempted by § 301 of the LMRA.

## II. DISCUSSION

### A. Plaintiff's CEPA and LAD State Law Claims and Section 301 of the LMRA

Plaintiff seeks remand of this case to New Jersey Superior Court because his claims neither "substantially depend" upon interpretation of the collective bargaining agreement ("CBA") nor are "inextricably intertwined" with the CBA in this case, and therefore Section 301 of the LMRA does not preempt plaintiff's claims. Defendants contend that this action is properly removed to this Court because the Court will be called upon to interpret the CBA in order to determine whether Defendants have breached the agreement and, in turn, violated state law. Thus, the issue that must be resolved in deciding this motion is whether Plaintiff's allegations that he was subjected to retaliation, for which he seeks remedies under the LAD and the CEPA, are "inextricably intertwined" with the terms of the CBA, and require interpretation of its provisions.

■ Where a plaintiff who is a subject to a labor contract seeks recovery for a violation of the CBA or where interpretation of the CBA is necessary in order to resolve the parties' claims, federal jurisdic-

tion is proper since section 301 of the LMRA confers upon federal courts exclusive jurisdiction to enforce labor contracts. *See* Labor Management Relations Act, 29 U.S.C. § 185(a), § 301(a). That section provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a), § 301(a). Disputes relating to the provisions of a CBA are thus appropriately circumscribed to the federal courts because Congress, in enacting the LMRA, intended to fashion a uniform body of federal labor law. *See Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 211, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985); *Textile Workers Union of America v. Lincoln Mills,* 353 U.S. 448, 456–57, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957); *see also Hawaiian Airlines, Inc. v. Norris,* 512 U.S. 246, 263 & n. 9, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994) (explaining that the principles of preemption under section 301 of the LMRA are applicable to the Railway Labor Act). However, not "every state-law suit asserting a right that relates in some way to a provision in a collective bargaining agreement, or more generally to the parties to such agreement, necessarily is pre-empted by § 301." *Allis–Chalmers,* 471 U.S. at 220, 105 S.Ct. 1904. Only where "resolution of the state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract [will the claim] either be treated as a § 301 claim or dismissed as pre-empted by federal labor-contract law." *Id.* (internal citation omitted).

■ Nor does mere reference to the collective bargaining agreement in the Complaint automatically cast the claim as one invoking federal labor law. *Livadas v. Bradshaw,* 512 U.S. 107, 124, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994) (explaining that "the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished"). Rather, as plaintiff points out, in deciding whether a plaintiff's state law claims are within the purview of section 301 of the LMRA for purposes of preemption, courts must determine whether the state law claims are "inextricably intertwined with consideration of the terms of the labor contract." *Allis–Chalmers,* 471 U.S. at 213, 105 S.Ct. 1904. " '[P]urely factual questions' about an employee's conduct or an employer's conduct and motives do not 'require a court to interpret any term of a collective-bargaining agreement.' " *Hawaiian Airlines,* 512 U.S. at 261, 114 S.Ct. 2239 (citing *Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 407, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988)).

### 1. *Plaintiff's CEPA Claim*

Plaintiff raises *Lingle v. Norge Div. of Magic Chef, Inc., supra,* as support that his CEPA claim is not "inextricably intertwined" with the interpretation of the CBA in this case. In *Lingle,* plaintiff alleged the state tort of retaliatory discharge for filing a workers' compensation claim. The Supreme Court discussed the plaintiff's burden of proof in demonstrating that he was discharged or threatened with discharge and that the employer's motive was to deter him from exercising his rights under the state workers' compensation act. The Court then reasoned that resolution of plaintiff's retaliatory discharge claim "pertains to the conduct of the employee and the conduct and motivation of the employer. Neither of the elements requires a

court to interpret any term of a collective-bargaining agreement." *Lingle*, 486 U.S. at 407, 108 S.Ct. 1877. The Supreme Court determined that, although. plaintiff was covered by a CBA that provided her with a contractual remedy for discharge without cause, the retaliatory discharge claim was not preempted by § 301 of the LMRA. The Court disagreed with the Seventh Circuit's conclusion that the retaliatory discharge tort was inextricably intertwined with the CBA merely because it implicated the same analysis of facts that would take place under the just cause provision of the CBA. Rather, "pre-emption merely ensures that federal law will be the basis for interpreting collective-bargaining agreements, and says nothing about the substantive rights a State may provide to workers when adjudication of those rights does not depend upon the interpretation of such agreements." *Id.* at 409, 108 S.Ct. 1877. The Supreme Court stated that "as long as the state-law claim can be resolved without interpreting the [CBA] itself," then the state law claim is "independent" of the CBA for § 301 preemption purposes. *Id.* at 410, 108 S.Ct. 1877.

 Plaintiff's CEPA claim likewise requires a fact-intensive examination. In this case, to establish a CEPA claim, a plaintiff must show that (1) he or she reasonably believed that his or her employer's conduct was violating either a law or rule; (2) that he or she performed whistle-blowing activity; (3) that an adverse employment action was taken against him or her; and (4) there was a causal connection between plaintiff's activi-

ty and the action. *See Mosley v. Femina*, 356 N.J.Super. 118, 127, 811 A.2d 910 (App.Div.2002) (citing *Kolb v. Burns*, 320 N.J.Super. 467, 476, 727 A.2d 525 (App. Div.1999)). Plaintiff alleges in his CEPA claim that he made numerous complaints to his supervisors of incidents of racial discrimination against African–American and other minority employees, theft of company property, and/or misappropriation of company funds by co-workers and supervisory level employees. Compl. ¶ 42. Plaintiff lists eight forms of retaliation that allegedly occurred, only one of which made reference to the CBA.[1]

Like *Lingle*, resolution of the elements of plaintiff's CEPA claim, for the most part, requires examination of the actions of plaintiff and actions and motivations of defendants, and does not rely upon interpretation of the CBA. Under the second and fourth prongs, whether plaintiff engaged in whistle-blowing activity and whether defendants acted because of that activity, will depend on the parties' actions and the motives for those actions. The issue of whether plaintiff reasonably believed that his employer's conduct was violating a rule or law, under the first prong, may implicate the CBA and its policy for hiring and promoting, but only to the extent that plaintiff's claim is based upon the failure of defendants to promote other minorities or himself for certain positions though they were qualified under the CBA. However, as asserted in Count I, plaintiff's CEPA claim is also based on the alleged theft of company property, and/or

---

1. Plaintiff alleges the following acts of retaliation in his CEPA claim: requiring plaintiff to work holidays although he had more seniority than other employees; assigning solely plaintiff to job tasks that required two or three workers; failing to award plaintiff a position in the safety department even though plaintiff was the number one ranked candidate under company and CBA required criteria; assign-

ing plaintiff to perform tasks not within his job description; assigning plaintiff to clean up toxic additives without protective gear; eliminating plaintiff's position while he was on medical leave; failing to accept plaintiff's bid for other positions; and reprimanding and threatening to terminate plaintiff for time missed from work while he was out on medical leave. Compl. ¶ 44.

misappropriation of company funds by co-workers and supervisory level employees. Thus, the CEPA claim as a whole is not reliant solely upon the CBA. In addition, plaintiff's allegation of racial discrimination appears to encompass more than just failure to promote or hire African–Americans for certain positions. As asserted in his Complaint, plaintiff alleges racial discrimination in the form of obscene and profane language and racial epithets towards minorities, Compl. ¶ 27, which may be analyzed without reference to the CBA.

Furthermore, the "CBA criteria" that plaintiff referred to are not found in the CBA. The CBA indicates that "[a]wards to positions will be made on the basis of qualifications for the position[,]" CBA, Fierko Cert. Ex. A, at 11, but nowhere explains or lists the qualifications for promotion. The Certification of Joseph Fierko, an engineering and maintenance manager for Exxon Mobil, indicates that the qualifications to be considered in assessing promotion or hire of employees are developed outside of the CBA:

> Exxon Mobil has developed an extensive procedure to address which employee within the bargaining unit is best qualified to receive a promotion or job transfer to a more favorable position within the bargaining unit. This procedure generally employs a number of methods to determine who is the best qualified individual for the position, including the use of position-specific written examinations and in-person interviews. In deciding which individual receives the promotion or transfer, Exxon Mobil has also considered a variety of factors to decide "qualifications for a position" such as: education level; experience level; prior work performance and attendance record.

See Fierko Cert. 1/24/03, ¶ 6. According to Mr. Fierko, whether an employee received a job or promotion over another employee who may have been more qualified, according to CBA criteria, requires consideration of the above identified factors of education level, experience, prior work performance, attendance record, and written examinations, none of which are referred to in the CBA. In addition, the CBA provides that "[t]he lines of promotion, demotion, and transfer shall as be set forth in progression charts which have been and which are to be established." CBA, Fierko Cert. Ex. A, at 9. The progression charts, as defendants submit, "are not attached or defined in the CBA[,]" but are prepared on a department-by-department basis and have varied over time. Defs.' Br. at 5. Thus, contrary to defendants' assertion, determination of whether plaintiff is well-founded in his allegation that certain employees were passed over for promotion does not require interpretation of any provision of the CBA, as the "qualifications" for considering applicants are neither explained nor given in the CBA.

Defendants argue that consideration of plaintiff's allegations of adverse employment action taken against him requires interpretation of the CBA because he alleges that defendants denied him a host of rights under the CBA. Specifically, in his CEPA claim, plaintiff alleges defendants retaliated against him because he was required to work holidays even though he had more seniority and longevity; he was assigned job tasks that required two or more workers; he was denied a job transfer although he was the number one ranked employee according to the CBA and company criteria; he was assigned tasks outside his job description; he was assigned to clean up toxic additives without protective gear even though it was not within his job duties; defendants eliminated his job while he was on medical leave; defendants failed to accept plaintiff's bid for a job; and defendants threatened to

terminate plaintiff for time missed from work while he was on medical leave. Compl. ¶ 44.

A majority of plaintiff's allegations do not require interpretation of a CBA provision. No reference to the CBA is needed to resolve plaintiff's allegations that he was denied a job transfer although he was the number one ranked employee according to the CBA and company criteria, as the qualifications for job transfers or promotions are located outside the provisions of the CBA, discussed above. Interpretation of the CBA also is not required for the allegations that defendants eliminated his job while he was on medical leave; defendants failed to accept plaintiff's bid for a job; and defendants threatened to terminate plaintiff for time missed from work while he was on medical leave. Determinations with regard to these allegations will be based, rather, on the actions of plaintiff and defendants.

With respect to whether plaintiff was assigned to work on a holiday despite his seniority and longevity, defendants submit that this requires interpretation of the "Seniority," "Holidays," "Overtime," and "Schedules" provisions of the CBA. The Schedules provision merely provides that schedules and revised schedules contain a four-week schedule, indicating the hours to be worked, and that they are posted twenty-one days in advance. CBA, Fierko Cert. Ex. A, at 3. There is nothing in plaintiff's allegations referring to a violation of that provision, nor can plaintiff's allegation regarding working on a holiday be deemed relevant to it. The same can be said of the "Overtime" provision of the CBA, which, *inter alia,* provides that time and a half shall be paid for overtime work, that overtime work will be distributed equitably, and that a worker shall receive not less than one hour of overtime pay when he or she works overtime. *See id.* at 5. There is nothing in plaintiff's CEPA allegations that refer to failing to receive overtime pay or receiving less overtime pay in violation of the provision.

The question regarding the "Holidays" and "Seniority" provisions is closer, but one that falls in plaintiff's favor. Plaintiff's allegation that he was made to work holidays even though he had the most seniority and longevity appears to refer to the Holiday provision, which defines which days are deemed holidays, *see* CBA, Fierko Cert. Ex. A, at 14–15, and the Seniority provision, which provides the basis for determining the seniority of workers, *see id.* at 8–9. The Holiday provision states that "[a]ll employees will be granted the day off with pay at their regular classified rate" and that volunteers will be allowed to work on a holiday. *Id.* at 15. While the CBA provides for employees to be granted the day off on holidays and the choice to work on those days, there is no provision in the CBA regarding assignment of work on a holiday based on the employees' seniority or longevity, or on any other criteria, however.

Rather, Mr. Fierko's Certification explains how shift work is done on a rotating schedule, which has "developed over time and is the Company's attempt to equitably distribute shift assignments to all of the employees in the department." Fierko Cert. ¶ 7. Mr. Fierko also states that Exxon Mobil has not forced holiday work on employees, but has used the same rotating procedure to assign shift work around the holidays. *See* Fierko Cert. ¶ 8. Resolution of whether plaintiff was retaliated against by working on holidays therefore requires consideration of the company's actions in implementing its rotating procedure for assigning regular and holiday shift work, none of which is discussed in any CBA provision. Although there may be incidental reference to the CBA to determine what the "holidays" are, such reference is only for definitional purposes and the CBA does not supply a rule of decision. As the

unanimous Supreme Court said in *Lingle,* "[T]he state-law remedy in this case is 'independent' of the collective-bargaining agreement in the sense of 'independent' that matters for § 301 pre-emption purposes: resolution of the state-law claim does not require construing the collective-bargaining agreement." *Lingle,* 486 U.S. at 407, 108 S.Ct. 1877 (footnote omitted).

Likewise, plaintiff's allegations of retaliation regarding performing tasks outside his job description, cleaning up toxic additives without protective gear even though it was not within his job duties, and solely performing a job task that required two or more workers, will involve comparing the assignments he performed, with the description of the job tasks of his position, neither of which is included in the CBA. Although Mr. Fierko states that "Exxon Mobil has evaluated job requirements and assignments on a department-by-department and position-by-position basis[,]" Fierko Cert. ¶ 9, none of these job descriptions are found in the CBA, and are impliedly found outside the CBA's written provisions. Whether plaintiff indeed performed tasks and cleaned up toxic materials that were outside his job description, and whether he performed tasks that were meant for more than one worker, require reference to the company's description of plaintiff's position and the job tasks plaintiff actually performed, all of which are found outside the CBA. Accordingly, under *Lingle,* plaintiff's state CEPA claim can be resolved without construing the CBA itself, and the claim is therefore independent of the CBA for § 301 preemption purposes.

Defendants' arguments that *Lingle* is distinguishable from the instant matter are not persuasive. First, defendants appear to suggest that *Lingle* applies only to retaliation claims brought under an Illinois workers' compensation act. *See* Def.'s Br. at 12. Nothing in the Supreme Court's holding in *Lingle,* "that an application of state law is pre-empted by § 301 of the Labor Management Relations Act of 1947 only if such application requires the interpretation of a collective-bargaining agreement," suggests that *Lingle* cannot be applied to the instant situation, nor do defendants provide any case law to the contrary. Second, while defendants are correct that the Supreme Court did not prohibit all § 301 preemption of state law retaliation claims when it stated that "[i]t is conceivable that a State could create a remedy that ... turned on the interpretation of a collective-bargaining agreement for its application," *Lingle,* 486 U.S. at 407–08 n. 7, 108 S.Ct. 1877, the present complaint does not fall within that category. Defendants' arguments therefore present no grounds for preemption in this case.

Although defendants cite to *Allis–Chalmers* for the proposition that any cause of action surrounding a breach of the CBA is preempted by the LMRA, defendants' contention is incorrect. The Supreme Court in *Allis–Chalmers,* examining the claim that defendants failed to make disability payments to plaintiff under the negotiated disability plan in the parties' CBA, held that when resolution of a state law claim is substantially dependent upon analysis of the terms of a CBA, that claim must be treated as a § 301 claim or dismissed as preempted by federal labor contract law. Because any attempt to assess defendants' liability would involve contract interpretation of the negotiated disability plan in the parties' CBA, the Supreme Court reversed the Wisconsin Supreme Court, and held that the complaint regarding disability payments should have been dismissed as preempted by § 301.

Resolution of plaintiff's CEPA claim in this case, unlike *Allis–Chalmers,* is not substantially dependent upon analysis of the terms of the CBA because plaintiff's

claims stem from his entitlement to rights under state law, not the collective bargaining agreement. Plaintiff specifically refers to the CBA once in his CEPA claim, alleging that defendants failed to award him a position even though he was a top candidate according to company and CBA criteria. Compl. ¶ 44. Analysis of plaintiff's allegation that he was a top candidate according to CBA and company criteria would not require substantial interpretation of the CBA, but rather the qualification factors determined outside of and not referenced in the CBA, as discussed above. Moreover, unlike a § 301 claim to enforce the CBA, the present claim grounded in state law, confers a remedy only if plaintiff's lack of promotion resulted from retaliation under CEPA. This Court also must examine defendants' actions and determine whether such actions constitute retaliation of an adverse nature. Whether plaintiff was qualified according to the CBA would provide reason for plaintiff's belief he was retaliated against, but would not be significant in determining whether defendants actually instituted an adverse employment action against him. Furthermore, the tenuous issue of whether plaintiff was most qualified according to the CBA plays an insignificant part of the retaliation inquiry, as plaintiff alleges eight (8) forms of adverse employment action that had occurred, the rest of which makes no mention of the CBA. Under *Allis–Chalmers*, neither of the above inquiries requires substantial dependence on or interpretation of the CBA. And, like *Lingle*, substantial analysis here pertains to the conduct of the employee and the conduct and motivation of the employer. Contrary to defendants' argument, plaintiff's CEPA claim is not "inextricably intertwined" with the CBA, and plaintiff's state claims are not preempted by § 301 of the LMRA.

Defendants raise *Medrano v. Excel Corp.*, 985 F.2d 230, 233 (5th Cir.), *cert. denied*, 510 U.S. 822, 114 S.Ct. 79, 126 L.Ed.2d 47 (1993), as support for the proposition that the CBA must be construed where "plaintiff relies directly upon a series of alleged violations of the CBA as the linchpin for his retaliation claims." Def.'s Br. at 14. In *Medrano*, the Fifth Circuit noted that it was not dealing with a typical straightforward case alleging retaliatory discharge under the workers' compensation law. Rather, plaintiff in that case alleged that he was discriminated against because he settled a workers' compensation claim, drawing a distinction between those who had filed workers' compensation claims but did not settle (not discharged) and those who filed workers' compensation claims and did settle (discharged). Thus, the Fifth Circuit made clear that the dispute was whether the settlement provision in the CBA, which was the basis for plaintiff's termination, was illegal or discriminatory. The Fifth Circuit, noting that the thrust of plaintiff's claim was that enforcement of the settlement provision of the CBA constituted a state tort, accordingly held that the CBA must be construed for resolution of the state law claim and his claim was therefore preempted by § 301 of the LMRA.

Unlike *Medrano*, plaintiff does not allege that a CBA provision itself is illegal or discriminatory, nor does he "rel[y] directly upon a series of violations of the CBA as the linchpin for his retaliation claims." Def.'s Br. at 14. For example, plaintiff does not allege that defendants' hiring policy itself, reflected in the "progression charts" and "departmental progression rules" as referred to in the CBA, Fierko Cert. Ex. A, is discriminatory or illegal,[2]

---

**2.** Plaintiff asserts that Mr. Fierko's certification provides support that none of the factors for promotion, including education level, ex-

perience level, prior work performance, and

nor does plaintiff base the majority, much less the entirety, of the complaint, on alleged violations of CBA provisions. Plaintiff alleges, rather, that he informed his employer that co-workers misappropriated funds, stole company property, and racially discriminated against certain employees. Further, the few references to the CBA that exist in the complaint hardly amount to "a series of alleged violations of the CBA." Certainly defendant doesn't claim that misappropriation, theft and racial discrimination by fellow employees are permitted under some construction of the CBA. Plaintiff's allegations consist of alleged violations of state law, and *Medrano* thus provides no support for defendants' contention that plaintiff's CEPA claim is preempted by § 301 of the LMRA.

Lastly, defendants assert that plaintiff's CEPA claim is preempted because the statutory language of CEPA requires the Court to interpret the CBA. CEPA provides:

> Nothing in this act shall be deemed to diminish the rights, privileges, or remedies of any employee under any other federal or State law or regulation or under any collective bargaining agreement or employment contract; except that the institution of an action in accordance with this act shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, State law, rule or regulation or under the common law.

N.J.S.A. 34:19–8. Defendants concede that they are not aware of any case addressing the significance of the CEPA statutory provision in the removal context, but argue that statutory language virtually identical to this supports preemption, citing *Bishop v. Bell Atlantic Corp.,* 81 F.Supp.2d 84 (D.Me.1999), *recons. denied,* No. 99–CV–189–B, 00–190B, 2001 WL 40910 (D.Me. Jan.11, 2001), and *Biagini v.*

*Berkshire Concrete Corp.,* 190 F.Supp.2d 170 (D.Mass.2002). Defs.' Br. at 15.

In *Bishop,* the court considered whether a plaintiff's state law claims for retaliation under the Maine Whistleblowers' Protection Act and the Maine Human Rights Act were preempted by § 301 of the LMRA. The district court determined that the Whistleblowers' Act claim was preempted by § 301 because the act's statutory language indicates that it does not "diminish or impair the rights" of those operating under a CBA, 26 M.R.S.A. § 837, and therefore "the Court is not permitted to engage in such interpretation." *Bishop,* 81 F.Supp.2d at 88. The court held that plaintiff's state Human Rights Act claim was not preempted because that act did not contain any similar provision, *see* 5 M.R.S.A. § 4572(1)(E).

Unlike *Bishop,* the statutory language of New Jersey's CEPA statute provides that should a plaintiff elect to bring suit under CEPA, he foregoes his rights under the CBA or other contract: "[T]he institution of an action in accordance with this act shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, State law, rule or regulation or under the common law." N.J.S.A. 34:19–8. Neither of the state law statutes in *Bishop* provides that a plaintiff may waive his rights under a CBA should he elect to bring a lawsuit instead. Defendants' argument under *Bishop* therefore fails.

Defendants' citation to *Biagini* suffers from a similar flaw. In *Biagini,* plaintiff claimed that defendant discriminated against him when it discharged him and refused to rehire him in violation of both §§ 75A and 75B. Sections 75A and 75B give preference in hiring to beneficiaries of workers' compensation and imposed a duty

---

attendance record, are listed in the CBA. *See* Pl.'s Reply Br. at 3 (citing Fierko Cert. ¶ 6).

to refrain from discriminating against such employees, concluding that "[i]n the event that any right set forth in this section is inconsistent with an applicable collective bargaining agreement . . . the collective bargaining agreement . . . shall prevail." Mass. Gen. Laws ch. 152, §§ 75A, 75B. The court held that plaintiff's discrimination claim under sections 75A and 75B(2) of the Massachusetts workers' compensation claim was preempted by § 301 of the LMRA because the CBA provisions could potentially conflict with §§ 75A and 75B, and at a minimum, the court would have to interpret these provisions to determine whether they are inconsistent with the rights set forth in §§ 75A and 75B.

The CEPA statute in this case contains no wording similar to the language in §§ 75A and 75B which gives preference to the terms of a CBA. As discussed above, the CEPA statute provides that if an employee chooses to bring suit, his rights under the CBA are waived. The CEPA statute, in contrast to the state laws in the *Biagini* or *Bishop* cases, explicitly avoids having to interpret any portion of the CBA, as plaintiff correctly points out. By filing suit alleging violations of CEPA, plaintiff is statutorily deemed to have waived any rights to a CBA remedy that he may have had. N.J.S.A. 34:19–8, *supra*. Accordingly, neither *Biagini* nor *Bishop* provides any support for defendants' argument that the CBA provisions could potentially conflict with CEPA such that interpretation of the CBA's language is required.

Based on the above, plaintiff's CEPA claim is not inextricably intertwined with the CBA, and the language of CEPA does not require the Court to interpret the CBA's provisions. Accordingly, plaintiff's CEPA claim is not preempted by s 301 of the LMRA.

### 2. *Plaintiff's LAD Claim*

■ Resolution of plaintiff's LAD claims of racial discrimination and hostile work environment also does not require interpretation or construction of the CBA in this case. To establish an LAD cause of action based on hostile work environment or racial harassment, plaintiff must show that the complained-of conduct (1) would not have occurred but for the employee's protected status, and was (2) severe or pervasive enough to make a (3) reasonable person believe that (4) the conditions of employment have been altered and that the working environment is hostile or abusive. *Taylor v. Metzger*, 152 N.J. 490, 498, 706 A.2d 685 (1998) (quoting *Lehmann v. Toys 'R' Us, Inc.*, 132 N.J. 587, 603–04, 626 A.2d 445 (1993)); *Shepherd v. Hunterdon Developmental Ctr.*, 174 N.J. 1, 24, 803 A.2d 611 (2002) (applying *Lehmann* standard to hostile work environment claims) (citing *Lehmann*, 132 N.J. at 603–04, 626 A.2d 445). The acts of retaliation of which plaintiff complains are: failing to promote plaintiff although he was the most qualified under company policy and CBA criteria; changing plaintiff's shift to less desirable ones despite plaintiff's seniority; failing to discipline co-workers for harassing plaintiff; and failing to investigate plaintiff's complaints of harassment and profane language. *See* Compl. ¶ 59. Plaintiff also alleges the following adverse employment actions: refusing plaintiff transfers to other positions for which he was eligible; ignoring plaintiff's bids for certain jobs; requiring plaintiff to work holidays despite his seniority; and improperly disciplining plaintiff. *Id.* ¶ 61. The Court does not determine whether such allegations state a claim under the LAD, but only determines whether such claims are preempted by § 301 in the present case.

As discussed above, determining whether plaintiff was qualified for other positions according to CBA criteria, and failing to transfer him despite his eligibility, requires examination of the characteristics identified by Mr. Fierko in his Certification, ¶ 6, such as education level, experience, prior work performance, and attendance record, none of which are listed in the CBA. In addition, determining whether plaintiff was retaliated against by having to work on holidays and receiving less desirable shifts, requires examination of the company's implementation of the rotating procedure it uses in assigning employees to shift work, which it also uses around the holidays, the purpose of which is to "equitably distribute shift assignments to all of the employees in the department." Fierko Cert. §§ 7–8. The description of this procedure is described in Mr. Fierko's Certification, not in any CBA provision. Moreover, plaintiff's allegation that his bids for jobs were ignored by Exxon Mobil does not involve an allegation that the company failed to advertise bids according to the provision included in the CBA, or that another employee who received a promotion did not apply according to procedure as outlined in the CBA, but rather that defendant declined to accept plaintiff's bids at all. Accordingly, resolution of plaintiff's LAD claim, as with plaintiff's CEPA claim, would not require interpretation of the CBA.

Plaintiff cites *Carrington v. RCA Global Communications, Inc.,* 762 F.Supp. 632 (D.N.J.1991), as support for his contention that his LAD claim is not inextricably intertwined with the CBA. In *Carrington,* the district court held that an employee's claim under the LAD for racial discrimination was not pre-empted by section 301 of the LMRA. *Carrington,* 762 F.Supp. at 642. There, the CBA contained a provision which expressly prohibited discrimination on the basis of various protected classifications. The defendants argued that plaintiff's discrimination claims under the LAD and the non-discrimination provision of the CBA were inextricably intertwined because the same issues brought in state court could have been resolved through the grievance procedure under the CBA. *Id.* at 640. This argument failed because, as the court explained, "state anti-discrimination laws are not preempted by § 301 of the LMRA because the right not to be discriminated against 'is defined and enforced under state law without reference to the terms of any collective bargaining agreement,' even where the labor contract itself prohibits discrimination." *Id.* at 641 (citation omitted). Thus, even where a provision in the CBA explicitly prohibited racial discrimination, the court held that this did not necessarily mean that the claim depends upon the interpretation of the CBA.

Like *Carrington,* the CBA in this case similarly has a provision prohibiting racial discrimination.[3] Plaintiff in his LAD claims noted that one of the ways he was discriminated against was that defendant Exxon Mobil failed to award him a position for which he was most qualified, according to CBA criteria. As *Carrington* makes clear, the allegation that Exxon Mobil violated the CBA's provision against racial discrimination does not necessarily render plaintiff's LAD claim preempted by § 301 of the LMRA. Plaintiff's LAD claim seeks the enforcement of state anti-discrimination law, which defines the right not to be discriminated against without reference to

---

**3.** Article II of the CBA under which the parties to this case operated provides:

There will be no discrimination against any employee because of race, creed, color or national origin, sex, age, handicap, disability or status as a disabled veteran or Vietnam-era veteran.

the terms of the parties' CBA. The Supreme Court's observation in *Lingle* also supports the conclusion that discriminatory treatment by an employer may not transform plaintiff's discrimination claim into a contractual one:

The operation of the antidiscrimination laws does, however, illustrate the relevant point for § 301 pre-emption analysis that the mere fact that a broad contractual protection against discriminatory—or retaliatory—discharge may provide a remedy for conduct that coincidentally violates state law does not make the existence or the contours of the state-law violation dependent upon the terms of the private contract.

*Lingle*, 486 U.S. at 412–13, 108 S.Ct. 1877. Like *Carrington*, even though the CBA in this case contains a provision prohibiting racial discrimination, plaintiff's claim under state anti-discrimination law will not be preempted by § 301 of the LMRA because the right not to be discriminated against is defined and enforced under state law without reference to the terms of any collective bargaining agreement.

Defendants raise *Kube v. New Penn Motor Exp., Inc.,* 865 F.Supp. 221, 234 (D.N.J.1994), as support for their contention that there may be instances where an LAD claim may be preempted by § 301 of the LMRA. In *Kube,* the district court found that a plaintiff's discriminatory discharge claim in violation of the LAD for failure to accommodate a disability was not preempted by § 301. *Id.* The defendant in *Kube* argued that analysis of the plaintiff's claim was intertwined with the parties' rights under the CBA because the CBA included a "modified work program" provision, which allowed the employer to determine whether an employee had the capacity to perform his job in the event of an injury. *Id.* at 227. The court, however, found the provision irrelevant to the plaintiff's claim and remanded the matter to state court. *Id.* at 228. Even had the CBA included a plan for accommodating handicapped employees, the determination as to whether the employer failed to properly accommodate the employee's disability in accordance with the LAD, would not turn on the meaning of any provision of the CBA but "actual events which transpired between plaintiff and defendant." *Id.* at 229. Hence, notwithstanding the inclusion of any modified work program or any provision purporting to satisfy rights provided by the LAD, "defendant still could not escape the obligations established by the NJLAD." *Id.* at 228.

While, as defendants point out, *Kube* recognized the possibility that a state law discrimination suit may be preempted by § 301 when based on a CBA provision, the court nevertheless determined that plaintiff's state law right was not subsumed by a CBA provision regarding a related topic. Like *Kube,* plaintiff seeks enforcement of his right not to be discriminated against under the state anti-discrimination law, which defines the right without reference to any collective bargaining agreement. Consideration of plaintiff's state law discrimination claim does not turn on the meaning of any provision of the CBA, but rather on the actual events that transpired between plaintiff and defendants. Defendants' argument therefore fails.

Accordingly, because plaintiff's LAD claim does not rely upon interpretation of a CBA provision, it is not inextricably intertwined with the CBA. Because resolution of plaintiff's LAD claim and CEPA claim does not require interpretation of the provisions of the CBA, plaintiff's motion to remand will be granted.

### 3. *Attorney's Fees*

■ Plaintiff argues that defendants should be ordered to pay plaintiff's attorney's fees, costs and expenses incurred in bringing this motion for remand. Section

1447 of Title 28 governs the procedure after removal and provides for the award of attorney's fees:

> If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded. An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal. A certified copy of the order of remand shall be mailed by the clerk to the clerk of the State court. The State court may thereupon proceed with such case.

28 U.S.C. § 1447(c). Such an award of fees, incurred as a result of removal, lies in the discretion of the court, and does not require a showing of bad faith, nor that the removal was fruitless. *See Eyal Lior v. Sit*, 913 F.Supp. 868, 878 (D.N.J.1996); *Shrader v. Legg Mason Wood Walker, Inc.*, 880 F.Supp. 366, 368 (E.D.Pa.1995).

█ In this case, which was improperly removed, plaintiff is entitled to recover his just costs and actual expenses, including attorney fees, to the limited extent that those expenses and counsel fees were incurred due to the removal itself. As a rule of thumb, plaintiff may recover the expenses and counsel fees reasonably incurred due to the efforts necessitated by defendants' removal of the case, including responding to the notice of removal and briefing issues related to the federal court's jurisdiction. Other services by plaintiffs' counsel, although performed after removal, which would have been as necessary in the state court, and were therefore not incurred due to removal, such as seeking and exchanging discovery on the merits and addressing motions unrelated to the federal claim upon which removal had been premised, are not recoverable services and expenses under section 1447(c).

The Court will permit plaintiff to file a post-remand affidavit for recovery of section 1447(c) expenses and fees. The provision for such fees and expenses will be placed into the remand order, as called for by section 1447(c), *supra.* The amount of the award may be determined after remand, *Mints v. Educ. Testing Serv.*, 99 F.3d 1253, 1257 (3d Cir.1996), and the federal court does not lose jurisdiction to adjudicate a post-remand application for fees. *Id.* at 1257–58.

Consistent with Rule 54(d)(2)(B), Fed. R.Civ.P., any affidavit of recoverable fees and expenses under section 1447(c) must be filed within fourteen days of the entry of the accompanying Order, enumerating all such items of expense and counsel fees as required by Local Civil Rule 54.2.[4] If plaintiff herein files such an affidavit, defendants shall have ten (10) days after receipt to file opposition, if any, and the Court will proceed to adjudicate the issue of the amount of such reimbursement based on the submissions.

### III. CONCLUSION

In conclusion, plaintiff's LAD and CEPA state law claims are not preempted by § 301 of the LMRA because they are not inextricably intertwined with the parties' collective bargaining agreement, and the Court need not interpret the provisions of the CBA to resolve plaintiff's claims. In addition, the remedy afforded by CEPA in this case does not require the Court to construe the provisions of the CBA. The Court will therefore grant plaintiff's motion for remand. Furthermore, because removal to federal court was improper, the plaintiff's request for reasonable attorney's

---

4. The normal 30–day time frame for submitting the affidavit of fees and expenses under L. Civ. R. 54.2(a) will be accelerated to the fourteen-day period of Fed.R.Civ.P. 54(d)(2)(B), to hasten resolution of any post-remand application.

fees arising solely from the improper removal will be granted under 28 U.S.C. § 1447(c). The accompanying Order will be entered.

### ORDER

THIS MATTER having come before the Court upon plaintiff Clifford Patterson's motion for remand the case to New Jersey Superior Court, Gloucester County, and for attorney's fees; and the Court having considered the parties' submissions; and for the reasons stated in the Opinion of today's date; and for good cause shown;

IT IS on this _____ day of May, 2003, hereby

ORDERED that Plaintiff's Complaint, alleging claims under the New Jersey Law Against Discrimination and the New Jersey Conscientious Employee Protection Act, and other state tort claims, is hereby **REMANDED** for lack of subject matter jurisdiction; and it is further

ORDERED that this case is hereby **REMANDED** to the Superior Court of New Jersey, Gloucester County, Law Division at Docket No. L–1923–02, for further proceedings; and it is further

ORDERED that plaintiff shall recover just costs and any actual expenses including attorney fees incurred as a result of the removal pursuant to 28 U.S.C. § 1447(c), provided that plaintiff shall submit his counsel's affidavit of such expenses and fees under L. Civ. R. 54.2 within fourteen (14) days of entry of this Order; opposition thereto is due ten (10) days after counsel's receipt of such affidavit.